Carita RICHARDSON, Infant, by S. & E. RICHARDSON, Guardians, et al., Appellants,

v.

RICHARDSON–MERRELL, INC., a Delaware Corporation, et al.

Nos. 87–7023, 87–7024.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1987.

Decided Sept. 27, 1988.

Barry J. Nace, with whom Thomas H. Tate, Lynn S. Spradley, Irving R.M. Panzer and Timothy D. Junkin, Washington, D.C., were on the brief, for appellants.

Mark L. Austrian, with whom John B. Williams and Frederick D. Baker, Washington, D.C., were on the brief, for appellee.

Geoffrey R.W. Smith and Bruce J. Brennan, Washington, D.C., were on the brief for Pharmaceutical Mfrs. Ass'n, amicus curiae, urging affirmance.

Before ROBINSON, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Carita Richardson and her parents brought an action in the District Court alleging that her congential limb defects resulted from ingestion of Bendectin by her mother, Etheleen, during her pregnancy. At the time, Bendectin, an anti-nausient drug, was manufactured by Richardson–Merrell, Inc., which since has been succeeded by Merrell–Dow Pharmaceuticals, Inc. Following a lengthy trial, the jury returned a verdict awarding damages in the sums of $1 million to Carita and $160,000 to the parents. On Merrell's motion, the District Court granted judgment n.o.v. in its favor, and the propriety of doing so is the single question on this appeal. After careful consideration of the record, we agree that the evidence was so one-sided as to warrant fully the court's action. Accordingly, we affirm.

1. Dicyclomine hydrochloride was dropped from the formulation of Bendectin in 1976.

2. Richardson, then age 38, had three other children, all of whom were born without birth defects.

3. Carita's left arm was deformed, with an underdeveloped humerus fused to the radius at the elbow and terminating in a hand with only two digits. Her right arm was normal. The right and left femurs were underdeveloped. Her lower left leg was normal, but she had no lower right leg at all. An appendage resembling a foot was attached to her right hip, and later was amputated.

## I. THE BACKGROUND

The Bendectin taken by Mrs. Richardson was a combination of pyridoxine hydrochloride (vitamin B–6), doxylamine succinate (an antihistamine), and dicyclomine hydrochloride (an antispasmodic).[1] In 1956, the drug was approved by the Federal Drug Administration (FDA) as safe for the treatment of nausea and vomiting during pregnancy. Between 1957, when Bendectin was initially marketed, and 1983, when Merrell discontinued marketing of the drug —apparently as the result of litigation— Bendectin was used by more than thirty million pregnant women. FDA approval has never been rescinded.

Early in her pregnancy,[2] Mrs. Richardson developed morning sickness, the nausea that pregnant women sometimes suffer. On her doctor's prescription, she began taking two Bendectin tablets at night and one in the morning. That she continued to do for at least the duration of the period of organogenesis—from about the 24th through the 56th day post-conception—the time during which Carita's limbs were forming in utero. Sadly, Carita was born with limb-reduction defects.[3]

### A. The Procedural History

Carita and her parents filed suit in the District Court for the District of Columbia. Along with over 1,500 other Bendectin lawsuits, the case was transferred for pretrial proceedings, pursuant to an order of the Judicial Panel on Multidistrict Litigation, to the Southern District of Ohio,[4] where a jury trial was held on the common issue of causation for all plaintiffs who had not opted out.[5] Because the Richardsons elect-

4. In re Richardson–Merrell, Inc. "Bendectin" Prods. Liab. Litig. (No. II), 533 F.Supp. 489 (J.P.M.D.L.1982).

5. The trial involved more than a thousand plaintiffs and resulted in a finding by the jury that Bendectin did not cause birth defects. In re Richardson–Merrell, Inc. "Bendectin" Prods. Liab. Litig., 624 F.Supp. 1212 (S.D.Ohio 1985) (M.D.L. No. 486), aff'd in part, vacated in part, and remanded with directions sub nom. In re Bendectin Litig., 857 F.2d 290 (6th Cir.1988).

ed not to participate in the common-issues trial, their case was retransferred to the District Court here.

At trial, to avoid a compromise verdict, the District Court submitted the case to the jury in two stages, first on the issue of causation and then on issues of failure to warn and damages. The jury found that Bendectin was a human teratogen, a substance capable of causing birth defects, when taken in recommended doses by a pregnant woman during the period of organogenesis of a unborn child and that Bendectin was the proximate cause of Carita's birth defects. The jury also found a lack of proper warning of the dangers associated with the drug, and accordingly, returned its $1.16 million verdict for the Richardsons.

Merrell moved for judgment n.o.v. or, in the alternative, for a new trial. The court

granted the motion for judgment n.o.v., holding that on the basis of the evidence presented no reasonable jury could find that Carita's birth defects were more likely than not caused by Bendectin.[6] Alternatively, the court granted Merrell's motion for a new trial[7] on the ground that the verdict was "clearly contrary to the weight of the evidence."[8]

The Richardsons argue that the District Court erred in both respects because there was sufficient credible evidence to support the verdict in their favor.[9] Merrell contends that judgment n.o.v. was proper because the opinions of the Richardsons' experts were inadequate to demonstrate causation by a preponderance of the evidence. After an exhaustive review of the trial transcript and the exhibits introduced by the parties, we conclude that judgment n.o. v. was appropriate.

6. *Richardson v. Richardson–Merrell, Inc.*, 649 F.Supp. 799, 799 (D.D.C.1986) [hereinafter *Richardson* ].

7. The court's action in this regard was in conformity with the procedure specified by Rule 50(c)(1) of the Federal Rules of Civil Procedure: "If the motion for judgment notwithstanding the verdict ... is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial."

8. *Richardson, supra* note 6, 649 F.Supp. at 799–800.

9. The Richardsons also assert that because this is a diversity case, the District Court disregarded the teaching of *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), by reaching a result different from that arrived at by the District of Columbia Court of Appeals in *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100 (1986), a Bendectin case in which substantially similar evidence was presented. There, as here, judgment n.o.v. had been granted following a jury verdict adverse to Merrell, but the Court of Appeals reversed on the ground that there was sufficient evidence to support the verdict.

In taking account of that decision, the District Court in this case concluded that although the *Oxendine* court summarized accurately the testimony presented, it "did not address the significance of certain evidence bearing upon the current state of scientific knowledge"—evidence elaborately presented in the case at bar. It was the District Court's view that the Court of Ap-

peals in *Oxendine* had "judicially reopened an esoteric 20–year-old controversy which is by now essentially settled within the scientific community." *Richardson, supra* note 6, 649 F.Supp. at 799.

Subsequent to oral argument in the case at bar, the defendant in *Oxendine* moved for relief from the judgment, and retrial of the case was ordered. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, Civ. No. 1245–82 (Super.Ct.D.C. Feb. 12, 1988) (memorandum order). An appeal from that ruling is now pending before the Court of Appeals, leaving unsettled the ultimate outcome in *Oxendine* and the decisional foundation thereof. But whatever the fate of *Oxendine* may be, the Richardsons' *Erie* challenge must be rejected. We note that the Richardsons' argument ignores the differences in the evidence presented in the two cases. Moreover, the *Erie* doctrine applies to state *substantive*, not *procedural*, law to be followed by federal courts exercising diversity jurisdiction. See, e.g., *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). In addition, it is clear that *Erie* does not affect the federal courts' application of the Federal Rules of Evidence. *Eli Lilly & Co. v. Home Ins. Co.*, 254 U.S.App.D.C. 1, 6, 794 F.2d 710, 715 (1986); see also C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4512 (1982). Because the admissibility of testimony, which is governed by the Federal Rules of Evidence, is the crux of our decision in this case, see *infra* notes 37–42 and accompanying text, the Richardsons' argument must be rejected.

Appellants also challenge the District Court's alternative grant of a new trial. Our disposition, however, makes it unnecessary for us to reach this issue.

## B. *The District Court's Opinion*

In granting judgment n.o.v., the District Court stated:

No reasonable jury could find on the basis [of the evidence presented] that this infant plaintiff's birth defects were more likely than not to have been caused by her intrauterine exposure to Bendectin; alternatively, even if such a finding were reasonable, it is nevertheless so clearly contrary to the weight of the evidence that the case must be retried.[10]

The court summarized the evidence, focusing on the testimony of Dr. Alan K. Done, the Richardson's principal witness on causation. On the basis of (1) Bendectin's chemical structure, (2) *in vitro* (test tube) studies, (3) *in vivo* (animal) teratology studies conducted by Merrill and others, and (4) the "human data" he had reviewed—epidemiological studies which he found "defective, inconclusive, or both"[11]—Dr. Done expressed the opinion that "to a 'reasonable degree of medical certainty,' Bendectin was not only 'capable' of causing birth defects in humans, but that it had, in fact, caused those limb defects with which Carita Richardson had been born."[12]

Despite this opinion, the court held that there was no "battle of experts" in this case, a circumstance which, if true, would have required that the verdict remain standing.[13] The court apparently concluded that there was not an adequate foundation for Dr. Done's theory on Bendectin, a theory undermined by an overwhelming array of contrary opinion published in the scientific literature and presented by the defense.

The District Court also examined closely the testimony of Dr. Raymond Seltser, an expert witness for the defense, who testified about the significance of the scientific literature on Bendectin. Dr. Seltser's review of the literature uncovered fourteen cohort studies and seven case control studies, "in none of which is there to be found a statistically significant increase in the relative risk of any congential limb malformations associated with Bendectin exposure."[14] By the court's estimate, "the importance of [Dr. Seltser's] testimony lies in his presentation of the totality of the published scientific literature [on Bendectin], which collectively represents the sum of all that can be said to be scientifically 'known' of the matter at present."[15] The court added:

Excepting their own empirical observations, the "literature" is to scientists both the ultimate authority as to and the most respected repository of scientific knowledge. And the literature on Bendectin, individually and in the aggregate, fails to demonstrate Bendectin's teratogenicity to a scientifically acceptable degree of accuracy.[16]

The District Court observed that Dr. Done had neither performed his own studies nor published his criticisms of the studies performed by others, but nonetheless testified in contradiction to "not only Dr. Seltser but to the findings of all those researchers who have studied and published in the twenty-odd years since the investigation of Bendectin began."[17]

The District Court also noted that Dr. Seltser's judgment regarding the current state of knowledge about Bendectin within the scientific community was corroborated by FDA's Fertility and Maternal Health Drugs Advisory Committee, which was convened in 1980 to evaluate the evidence on

---

10. *Richardson, supra* note 6, 649 F.Supp. at 799.

11. *Id.* at 801. Epidemiology is the study of the frequency of disease in human populations and the way in which the frequency varies from one population to another.

12. *Id.*

13. *Id.* at 801–802; see *Ferebee v. Chevron Chem. Co.,* 237 U.S.App.D.C. 164, 170, 736 F.2d 1529, 1535 (1984) ("[t]he case was thus a classic battle of the experts, a battle in which the jury must decide the victor").

14. *Richardson, supra* note 6, 649 F.Supp. at 802 n. 9.

15. *Id.* at 802.

16. *Id.*

17. *Id.*

alleged Bendectin-related malformations.[18] After studying the literature and considering testimony presented during a two-day hearing, the Committee concluded that there was no increased incidence of birth defects among Bendectin-exposed infants; that there was no need for further animal or epidemiological studies; and that Bendectin should not be withdrawn from the market.[19] FDA adopted the findings of the Committee and has not since changed its position.[20]

The District Court concluded that in light of Bendectin research and the published literature, Dr. Done's opinion was beyond the range of acceptability. The court's summary of its analysis is succinct:

> Though Dr. Done might disagree, there is now nearly universal scientific consensus that Bendectin has not been shown to be a teratogen, and, the issue being a scientific one, reasonable jurors could not reject that consensus without indulging in precisely the same speculation and conjecture which the multiple investigations undertook, but failed, to confirm. That Dr. Done remains an unbeliever and was willing to testify to his disbelief "with reasonable medical certainty" does not mandate that this case be left as the jury decided it. Without a genuine basis "in or out of the record," even his expert "theoretical speculations" are insufficient to sustain the

plaintiff's burden of proving, by a preponderance of the evidence, that Bendectin not only causes congenital defects generally, but that, in particular, it caused those limb reduction defects with which Carita Richardson was most unfortunately born.[21]

As a result, the court granted Merrell's motion for judgment n.o.v.

## II. STANDARD OF REVIEW

■ The standard for awarding judgment n.o.v. is the same as that governing rulings on motions for directed verdicts.[22] Judgment n.o.v. is proper only if, viewing the evidence in the light most favorable to the plaintiff and giving him the advantage of every fair and reasonable inference that the evidence may permit, there can be but one reasonable conclusion drawn.[23] "If fair-minded people may differ as to the conclusion, or if there is substantial conflicting evidence," we have said, "the judgment n.o.v. motion must be denied."[24] The court must consider all of the evidence offered by the parties, but it should neither assess witness credibility nor weigh the evidence.[25] On appeal, this court's review of the action taken on such a motion stress the same course as that binding on the District Court when it considered the motion beforehand.[26] "Because a motion for judgment n.o.v. intrudes upon the jury's domain, that question is very narrow."[27]

18. *Id.* at 802–803.

19. *Id.*

20. *Id.*

21. *Id.* at 803 (citing *Merit Motors, Inc. v. Chrysler Corp.,* 187 U.S.App.D.C. 11, 18, 569 F.2d 666, 673 (1977)).

22. *Coburn v. Pan Am. World Airways,* 229 U.S. App.D.C. 61, 64, 711 F.2d 339, 342 (1983); *Vander Zee v. Karabatsos,* 191 U.S.App.D.C. 200, 203, 589 F.2d 723, 726 (1978).

23. *Carter v. Duncan–Huggins, Ltd.,* 234 U.S.App. D.C. 126, 128, 727 F.2d 1225, 1227 (1984); *Coburn v. Pan Am. World Airways, supra* note 22, 229 U.S.App.D.C. at 64, 711 F.2d at 342; *Metrocare v. Washington Metro. Area Transit Auth.,* 220 U.S.App.D.C. 104, 106, 679 F.2d 922, 924 (1982); *Vander Zee v. Karabatsos, supra* note 22, 191 U.S.App.D.C. at 203, 589 F.2d at 726.

24. *Carter v. Duncan–Huggins, Ltd., supra* note 23, 234 U.S.App.D.C. at 128, 727 F.2d at 1227.

25. *Id.* at 128–129, 727 F.2d at 1227–1228.

26. *Id.* at 128, 727 F.2d at 1227.

27. *Id.* It is of no moment that the District Court granted judgment n.o.v. instead of taking the case from the jury earlier by directing a verdict for Merrell. We have frequently counseled that "the better practice in such situations is to let the case go to the jury and, if it finds liability, to set [the verdict] aside." *Law v. Virginia Stage Lines, Inc.,* 144 U.S.App.D.C. 115, 116–117, 444 F.2d 990, 991–992 (1971); see also *Peigh v. Baltimore & O.R.R.,* 92 U.S.App.D.C. 198, 202, 204 F.2d 391, 396 (1953) ("if there is room for a difference of opinion, the wise course is for the trial judge to allow the case to go to the jury. If a verdict is deemed by the court to be contrary to the evidence, judgment may be entered *non obstante veredicto*").

Recently, in *Anderson v. Liberty Lobby, Inc.*,[28] a summary judgment case, the Supreme Court clarified the standard for determining when it is appropriate to take a case from the jury.[29] *Anderson* was a libel action in which the Court reversed this circuit's holding that the clear-and-convincing evidentiary standard need not be taken into consideration at the summary judgment stage. "[W]e are convinced," the Court explained, "that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[30] In a run-of-the-mill civil case, the Court noted, "[t]he judge's inquiry ... unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."[31] Thus, the Court concluded that "the judge must view the evidence presented through the prism of the substantive evidentiary burden."[32]

■ The Court, citing long-established precedent, pointed out that a judge is not required to submit a case to the jury " 'merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' "[33] "If the evidence is merely colorable, or is not significantly probative," the Court stated, "summary judgment may be granted."[34] Thus, the question for us is not whether there was *some evidence*,[35] but whether, in terms of "the actual quantum and quality of proof necessary to support liability,"[36] there was *sufficient evidence* upon which a jury could properly base a verdict for the Richardsons. They, as plaintiffs, had the burden of proving by a preponderance of the evidence that Bendectin was capable of causing birth defects of the types Carita Richardson suffered. To survive a motion for judgment n.o.v., the

---

28. 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

29. The Court noted that the standard for direction of a verdict mirrors the standard for summary judgment, and that action in either instance is proper "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250, 106 S.Ct. at 2511, 91 L.Ed.2d at 213. The Court pointed out that " '[t]he primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted,' " *id.* at 251, 106 S.Ct. at 2515, 91 L.Ed.2d at 214 (quoting *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 2171 n. 11, 76 L.Ed.2d 277, 290 n. 11 (1983)), but that "[i]n essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," 477 U.S. at 251–252, 106 S.Ct. at 2515, 91 L.Ed.2d at 214. Because the identical standard governs a court's ruling on a motion for judgment n.o.v., *Coburn v. Pan Am. World Airways, supra* note 22, 229 U.S.App.D.C. at 64, 711 F.2d at 342; *Vander Zee v. Karabatsos, supra* note 22, 191 U.S.App.D.C. at 203, 589 F.2d at 726; see also *Lester v. Dunn,* 154 U.S.App.D.C. 399, 401, 475 F.2d 983, 985 (1973), the *Anderson* decision provides guidance in this case as well.

30. 477 U.S. at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

31. *Id.*

32. *Id.* at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215.

33. *Id.* at 251, 106 S.Ct. at 2511, 91 L.Ed.2d at 213 (quoting *Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1872)).

34. 477 U.S. at 249–250, 106 S.Ct. at 2511, 91 L.Ed.2d at 212 (citations omitted); see also *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, 592–593 (1968) (in face of defendant's properly supported motion for summary judgment, plaintiff cannot get to the jury without "any *significant probative evidence* tending to support the complaint") (emphasis added); accord, *Merit Motors, Inc. v. Chrysler Corp., supra* note 21, 187 U.S.App.D.C. at 14, 569 F.2d at 669.

35. The scintilla rule has long been abolished in this circuit. *Baltimore & O. R.R. v. Postom,* 85 U.S.App.D.C. 207, 208, 177 F.2d 53, 54 (1949).

36. 477 U.S. at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215. The Court stressed that its holding did not denigrate the role of the jury. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," whether the motion is for a summary judgment or a directed verdict. *Id.* at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216.

evidence they introduced had to be more than merely colorable; it must have been significantly probative if the jury's verdict is to stand.

### III. THE EVIDENCE

■ The question whether Bendectin causes limb reduction defects is scientific in nature, and it is to the scientific community that the law must look for the answer. For this reason, expert witnesses are indispensable in a case such as this. But that is not to say that the court's hands are inexorably tied, or that it must accept uncritically any sort of opinion espoused by an expert merely because his credentials render him qualified to testify. The District Court ruled that Dr. Done's opinion lacked "a genuine basis, 'in or out of the record,'" and that his "theoretical speculations" could not sustain the Richardsons' burden of proving causation.[37] Whether an expert's opinion has an adequate basis, and whether without it an evidentiary burden has been met, are matters of law for the court to decide. We conclude that Dr. Done's opinion lacks an adequate basis and therefore, whether viewed alone or in conjunction with those of the other experts,[38] did not provide the "substantial probative evidence" that would require us to leave the verdict as the jury rendered it.

Federal Rule of Evidence 703 lays the foundation for our consideration of what constitutes adequate expert testimony.[39] That rule provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

As we have heretofore stated, Rule 703 "was intended to broaden the acceptable bases of expert opinion, but it was not intended ... to make summary judgment impossible whenever a party has produced an expert to support its position;"[40] rather, we emphasized, "the grounds relied on by an expert must be 'a type reasonably relied upon by experts in the particular field.'"[41] Similarly, it has been held that a scientific causation issue may be removed from the jury on a motion for a directed verdict if the evidence only "provides a 'mere possibility' yet not a 'probability' of proof."[42]

We must therefore look behind Dr. Done's ultimate conclusion that Bendectin causes birth defects and analyze the adequacy of its foundation. Dr. Done predicated his opinion upon four different factors: (1) chemical structure activity analysis, (2) *in vitro* (test tube) studies, (3) *in vivo* (animal) teratology studies, and (4) epidemiological studies.

In speaking of chemical structure activity analysis, Dr. Done referred to the concept that drugs with similar chemical structures may be expected to have similar properties and produce analogous effects.[43] Dr. Done noted the similarity of the chemical structures of doxylamine succinate, the

---

**37.** *Richardson, supra* note 6, 649 F.Supp. at 803.

**38.** Despite appellant's suggestion, Brief for Appellant at 5, 40, the number of experts presented does not in itself preclude a finding that there was insufficient evidence or automatically create an issue for the jury. To create such an issue, an expert must be qualified to testify as to causation and the opinion given must have an adequate foundation. Our treatment of Dr. Done's testimony subsumes that of the other experts presented on Richardsons' behalf. See notes 40–55 *infra* and accompanying text.

**39.** Other relevant rules are Fed.R.Evid. 702, which permits admission of expert testimony only if it will assist the trier of fact, and Fed.R.

Evid. 403, which allows the trial court to exclude testimony if it is misleading or confusing, or if its probative value is outweighed by considerations of prejudice, confusion, or waste of time.

**40.** *Merit Motors, Inc. v. Chrysler Corp., supra* note 21, 187 U.S.App.D.C. at 18, 569 F.2d at 673.

**41.** *Id.* (quoting Fed.R.Evid. 703).

**42.** *Marder v. G.D. Searle & Co.*, 630 F.Supp. 1087, 1093–1094 (D.Md.1986), *aff'd without opinion sub nom. Wheelahan v. G.D. Searle & Co.*, 814 F.2d 655 (4th Cir.1987).

**43.** Trial Transcript (Tr.) 797.

antihistamine component of Bendectin, and other antihistamines.[44] He then stated that "it has been known for quite awhile that antihistamines have for the most part, been capable of adversely affecting human development, including causing birth defects at least in animals. The question is not fully answered in humans yet with regard to any specific antihistamine or the group in general, but at least it does *indicate a suspicion.*"[45] As Dr. Done acknowledged, the purpose of analyzing chemical structures is to indicate what other directions a study of a substance should take; in other words, chemical structure activity analysis "gives you a clue," or "raises at least a flag to you indicating that this is a drug that you ought to and must study for teratologic effect because you may be missing something important if you don't."[46] It is thus apparent from Dr. Done's own testimony that the value of chemical structure analysis, standing alone, is extremely limited.

Dr. Done also acknowledged that *in vivo* (animal) teratology studies are similarly of but scant utility in drawing conclusions about whether a substance will cause birth defects in humans. "The fact that [a substance does so] in an animal," he conceded, "doesn't necessarily mean it will in humans, but it does mean, again, that it is likely enough to do so in humans that you have to accept the notion that it will do that unless you prove otherwise. It just increases the need to prove otherwise."[47] Dr. Done further stated that "you know that you are limited in how much you can make of this with regard to humans, but, nonetheless, it is a good place to start."[48] Here, as earlier, Dr. Done acknowledged that the *in vivo* studies served merely to raise a suspicion regarding the effect of Bendectin on humans, which by his estimate no other evidence had sufficed to wipe out.[49] Indeed, on cross-examination,

Dr. Done agreed that "animal data alone would not be a sufficient bases for you to give an opinion with reasonable medical certainty that Bendectin causes birth defects in humans."[50]

The *in vitro* (test tube) experiments relied on by Dr. Done studied the effects of Bendectin components upon frog nerve fibers and the mesenchyme cells of mouse limb buds for evidence that similar or other defects might occur in humans. Again, the value of such an examination as a predictor of human teratogenicity is extremely meager, and once again we find ourselves in the realm of suspicion. Positive results from *in vitro* studies may provide a clue signaling the need for further research, but alone do not provide a satisfactory basis for opining about causation in the human context.

These three types of studies then—chemical, *in vitro*, and *in vivo*—cannot furnish a sufficient foundation for a conclusion that Bendectin caused the birth defects at issue in this case. Studies of this kind, singly or in combination, are not capable of proving causation in human beings in the face of the overwhelming body of contradictory epidemiological evidence. Perhaps mindful of this, the last type of evidence considered by Dr. Done consisted of the epidemiological studies. When such studies are available and relevant, and particularly when they are numerous and span a significant period of time, they assume a very important role in determinations of questions of causation. Dr. Done himself conceded the import of this literature when he agreed on cross-examination that "in connection with the animal studies ... because so many substances are teratogenic in animals, before you can make a conclusion that a substance is teratogenic in humans, you must look to the human data."[51] Dr. Done also acknowledged the necessity of a statistically significant association be-

44. Tr. 821–822.

45. Tr. 823 (emphasis added).

46. Tr. 798.

47. Tr. 800.

48. Tr. 799–800.

49. Tr. 824–825.

50. Tr. 1104.

51. Tr. 1104.

tween the drug and its effect in human populations:

Q. ... Wasn't it true that you would not give an opinion as to causation without a statistically significant association in humans between the ingestion of a drug and a cause of birth defects?

A. That is right, not above reasonable degree of medical certainty.

Q. Scientifically—

A. That is right.

Q. Putting aside medical certainty and what you are testifying here, as a scientist, you could not give an opinion as to causation without a statistically significant relationship in humans between ingestion of the drug and the malformations; isn't that correct, Doctor?

A. That is fair.[52]

Dr. Done further admitted that no one who has published work on Bendectin has concluded that there is a statistically significant association between Bendectin and limb reduction defects of the type at issue in this case.[53] Only by recalculating the data was Dr. Done able to obtain what he deems a statistically significant result.[54] Moreover, the studies rejected by Dr. Done had been published in peer-reviewed scientific journals, while Dr. Done has neither published his recalculations nor offered them for peer review.[55]

Since the Richardsons had the burden of proving that Bendectin causes birth defects, the law cannot tolerate a presumption of teratogenicity. That may be prudent in the medical community at the early stages of research where caution is vital and suspicion comes naturally, but it obviously is not acceptable when teratogenicity becomes an issue in a judicial tribunal.

The First Circuit expressed similar concerns in *Lynch v. Merrell–National Laboratories Division of Richardson–Merrell, Inc.,*[56] which involved an attempt to link Bendectin to the plaintiff's limb defects. The court noted the growing body of law recognizing the importance of epidemiologic evidence in establishing causation in cases in which no direct evidence is available.[57] The *Lynch* court found that the epidemiological studies on Bendectin concluded overwhelmingly that the drug does not cause birth defects.[58] As a result, the court ruled that Dr. Done's proffered testimony—the same sort of testimony that he gave in the case at bar—was inadmissible,[59] and affirmed a grant of summary judgment for the defendant.

The Richardsons, however, direct attention to our decision in *Ferebee v. Chevron Chemical Co.,*[60] which involved the question whether paraquat exposure caused pulmonary fibrosis. We think reliance thereon is misplaced here. *Ferebee* is an

52. Tr. 1137.

53. Tr. 1351.

54. Tr. 1351.

55. In *Perry v. United States,* 755 F.2d 888 (11th Cir.1985), proof of causation was found lacking at the trial level. The epidemiological findings of a medical expert regarding a statistical connection were rejected because of the expert's methodology; it was criticized as reflecting the witness' predisposition to arrive at particular conclusions, and as devoid of any peer review of the expert's study. *Id.* at 892. The court found that the testimony of the remaining witnesses was not sufficient to demonstrate causation by a preponderance of the evidence. *Id.* at 893. "Despite appellant's protestations," the court said, "the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine." *Id.* at 892.

56. 830 F.2d 1190 (1st Cir.1987), *aff'g,* 646 F.Supp. 856 (D.Mass.1986).

57. *Id.* at 1193–1194.

58. *Id.* at 1194.

59. Whenever expert testimony lies "at the periphery of what the scientific community considers acceptable, special care should be exercised in evaluating the reliability and probative worth of the proffered testimony under Rules 703 and 403." *In Re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223, 1242 (E.D.N.Y.1985). In mass tort cases where there is no real understanding of the organic cause of the disease or defect, epidemiologic studies are of critical significance. *Id.* at 1239–1240. At least where epidemiological evidence was available, animal studies "are of so little probative force and are so potentially misleading as to be inadmissible." *Id.* at 1241.

60. 237 U.S.App.D.C. 164, 736 F.2d 1529 (1984).

example of "a classic battle of the experts, a battle in which the jury must decide the victor."[61] The defendant attempted to discredit the opinions of the plaintiff's experts on the ground that their views, "while not rejected by the medical community, are sufficiently novel *at this point* to be inadmissible."[62] We said:

> [A] cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, ... products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical.[63]

We noted the possibility that the case may have been the first of its type, or that the plaintiff's doctors may have been the first alert enough to recognize a causal connection between paraquat and pulmonary fibrosis.[64] We observed, too, that the fact that "science would require more evidence before conclusively considering the causation question resolved is irrelevant."[65] Thus *Ferebee* stands for the proposition that courts should be very reluctant to alter a jury's verdict when the causation issue is novel and *"stand[s] at the frontier of current medical and epidemiological inquiry."*[66] If experts are willing to testify to causation in such situations and their methodology is sound, the jury's verdict should not be disturbed.

The case before us, however, is not like *Ferebee.* Indeed, we are at the other end of the spectrum, a great distance from the "frontier of current medical and epidemiological inquiry." And far from a paucity of scientific information on the oft-asserted claim of causal relationship of Bendectin

and birth defects, the drug has been extensively studied and a wealth of published epidemiological data has been amassed, none of which has concluded that the drug is teratogenic. Uniquely to this case, the law now has the benefit of twenty years of scientific study, and the published results must be given their just due.

## IV. CONCLUSION

The circumstances of the case are tragic and Carita Richardson's plight evokes the utmost sympathy. It would be foolhardy to expect members of the jury to be without compassion for the catastrophe that befell this family. That is a natural response of the human spirit, and is without legal consequence so long as it is properly controlled. But in a case such as this it not only is appropriate but indeed imperative that the court remain vigilant to ensure that neither emotion nor confusion has supplanted reason.

We arrive at our conclusions in this case fully cognizant of and particularly sensitive to the importance of the jury's role in our legal scheme. As in *Stacey v. Allied Stores,*[67] an age discrimination case in which a judgment n.o.v. was overturned, we are advertent to "the extraordinary judicial deference owed to jury verdicts in our system of law."[68] We realize that

> [w]e are not to tamper lightly with the considered judgment of those drawn together at one point in time to render a judgment that is representative of the good common sense of the American people. It goes without saying that few institutions are as venerable as that of trial by jury, enshrined at the Founding in the Bill of Rights and hallowed by an enormous body of English and American law that commands judges, who are of all officials the least accountable to the

---

**61.** *Id.* at 170, 736 F.2d at 1535.

**62.** *Id.* (emphasis in original).

**63.** *Id.* at 170–171, 736 F.2d at 1535–1536.

**64.** *Id.* at 171, 736 F.2d at 1536.

**65.** *Id.*

**66.** *Id.* at 169, 736 F.2d at 1534 (emphasis added).

**67.** 247 U.S.App.D.C. 285, 768 F.2d 402 (1985).

**68.** *Id.* at 289, 768 F.2d at 406.

people, not to invade the province of judgment by the people.[69]

In *Stacey*, however, this court "discern[ed] no principled basis for concluding that [the] verdict was infected by prejudice or premised upon surmise, conjecture, or a mere scintilla of evidence." [70] We agree wholeheartedly with the court's sentiments and have no quarrel with the result. Particularly in an age discrimination case such as *Stacey*, the jury is well equipped to evaluate the evidence and use its "good common sense" to come to a reasoned decision. The case at bar, however, is in a different category. The scientific issues are complex, the trial was lengthy, and the evidence and testimony were often difficult to understand. There was an emotional factor at play, a circumstance we are not at liberty to ignore.

It is important to also stress that the District Court's grant of judgment n.o.v. in this case did not usurp the jury's function. Whether an expert's opinion has an adequate basis, and whether without it an evidentiary burden has been carried, are issues of law falling within the province of the court. "[T]he law in its wisdom," we have observed, "has invested trial judges with the power to correct juries who base their verdicts on considerations not embodied in the evidence." [71] In this case, the District Court did exactly that and nothing more.

The judgment appealed from is accordingly *Affirmed*.

---

69. *Id.*

70. *Id.* at 292, 768 F.2d at 409.

71. *Law v. Virginia Stage Lines, Inc., supra* note 27, 144 U.S.App.D.C. at 119, 444 F.2d at 994.