**Ann R. FORMAN, Administratrix of the Estate of Brian Forman, deceased, Plaintiff,**

v.

**L. Harrison PILLSBURY, M.D., Defendant.**

**Civ. A. No. 85–671 SSH.**

United States District Court, District of Columbia.

Nov. 29, 1990.

---

Paul Blumenthal, Washington, D.C., for plaintiff.

Gary Godard, Fairfax, Va., for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This case is before the Court on defendant's post-trial motion for judgment n.o.v. or, alternatively, for a new trial, remittitur, or application of pro tanto credit. Upon consideration of the defendant's motion, plaintiff's opposition, and the entire record, the Court holds that plaintiff did not present any evidence to support a reasonable finding of either negligence or causation and therefore grants defendant's motion for judgment notwithstanding the verdict. In the alternative, the Court conditionally grants defendant's motion for a new trial on the grounds that the verdict is against the clear weight of the evidence and that plaintiff's counsel's opening statement unfairly prejudiced the defendant.

### Background

This case arose out of the death of Brian Forman at age five following a persistent history of serious illness. Brian's mother brought this action on behalf of his estate, claiming wrongful death and survivorship damages against Dr. Pillsbury. Plaintiff also filed an action in New York against several doctors at Mt. Sinai Hospital in that city who had diagnosed and cared for Brian. The Court stayed this action pending resolution of the New York lawsuit, which settled on the last day of trial. After a two-week jury trial in this Court, the jury found in favor of the plaintiff and awarded her a total of $350,000.00.

The evidence at trial showed, sadly, that Brian was an extremely ill child almost from birth. In 1981, Dr. Hirschhorn of Mt. Sinai Hospital diagnosed Brian's illness as Mixed Connective Tissue Disease.[1] Doctors at Mt. Sinai initiated treatment with Prednisone, a steroid, which the defendant in turn prescribed through a local pharmacy. The Prednisone treatment caused a variety of serious and painful side effects including vomiting, diarrhea, cyanosis and extreme lethargy. Brian's underlying illness also caused numerous uncomfortable symptoms. In April 1983, the Mt. Sinai doctors discontinued the Prednisone and began treatment with Imuran, a drug that suppresses white blood cell production. Because of this potentially dangerous effect, the doctors recommended a schedule for closely monitoring Brian's blood. The schedule called for weekly white blood

---

1. Plaintiff maintained throughout this litigation and in her trial testimony that the diagnosis was incorrect. This assertion is not relevant to defendant's motion for judgment n.o.v. because defendant did not make the diagnosis and because it does not relate to the allegedly negligent failure to monitor Brian's blood count.

count checks (WBCs) at the outset and monthly checks when Brian's white blood cell level became stable at a level between 4,000 and 10,000. Dr. Pillsbury prescribed the medicine through a local pharmacy and undertook to monitor the Imuran treatment according to the Mt. Sinai doctors' instructions.[2]

Brian's Imuran treatment lasted from April 1983 until late September 1983 when a WBC done at Fairfax Pediatric Associates revealed a low white blood cell count of 2,300. Plaintiff notified a doctor at Mt. Sinai of this low count and he recommended discontinuing the Imuran treatment. Brian was diagnosed at Mt. Sinai hospital on October 6, 1983, as leukopenic secondary to Imuran; his white blood cell count had dropped to 600. Although the Imuran was discontinued, Brian's white blood cell count remained suppressed and Brian was admitted to Mt. Sinai several times between November 1983 and February 1984. Brian was admitted to Georgetown University Hospital through its emergency room on February 22, 1984. He suffered two coronary arrests and died on February 27, 1984.

Plaintiff's theory at trial was that the Mt. Sinai monitoring schedule represented the standard of care and that Dr. Pillsbury was obligated to abide by the schedule. Uncontroverted evidence showed that WBCs were conducted consistently up to July 20, 1983, when Brian's white blood count was well within the target range. Defendant did not conduct all of the WBCs up to that time. After the July 20 WBC,

the next test should have been performed in late August. Defendant was away from the Washington, D.C., area on vacation during that time, and a WBC was not performed until late September, when Fairfax Pediatric Associates discovered that Brian's count was low. Plaintiff contended that defendant should have made some alternative provision for a WBC during August to comply with Mt. Sinai's schedule. Defendant maintained that it was reasonable for him to expect that the plaintiff, an intelligent and well-educated woman who actively participated in her son's medical treatment, would arrange for a WBC at Fairfax Pediatric Associates or elsewhere.

According to plaintiff's own testimony, she continually alternated calls and visits to the defendant and the Mt. Sinai doctors during Brian's illness, particularly during the Imuran treatment. Plaintiff's summary of Brian's medical treatment in her complaint included many actions taken by the Mt. Sinai doctors and many innocuous actions taken by the defendant. This complicated factual background included many allegations of negligence unconnected to the defendant and unsubstantiated by the proposed evidence. On defendant's pretrial motion, the Court orally clarified that the only relevant alleged negligence on Dr. Pillsbury's part was failing to monitor Brian's white blood cell count adequately. More specifically, the Court restricted the issue of negligence to defendant's failure to conduct a white blood cell check (WBC) in August 1983.[3]

---

**2.** The parties disputed at trial whether the Mt. Sinai doctors or Dr. Pillsbury were "in charge" of Brian's Imuran treatment. Plaintiff contended inconsistently that Dr. Pillsbury was at all times Brian's primary physician but that he was obligated to follow Mt. Sinai's recommendations and to report all WBC results to Mt. Sinai. In addition, plaintiff recanted the testimony which she gave in the New York trial that the doctors at Mt. Sinai were primarily responsible for Brian's care. Although the question of Dr. Pillsbury's role was a point of honor between the parties, it is not material to defendant's motion for judgment n.o.v. The distribution of responsibility between the doctors at Mt. Sinai and defendant does not bear on plaintiff's allegations that the monitoring schedule represented

the standard of care and that defendant deviated from that standard.

**3.** Plaintiff argues in her opposition to defendant's motion that the alleged negligence was broader than one missed WBC. Plaintiff maintains that defendant failed to follow the monitoring schedule from the outset and failed to report the WBC results to Mt. Sinai. Plaintiff contends that these actions also constituted a breach of the standard of care and a relevant basis for a finding of negligence. Because the Mt. Sinai instructions did not require defendant to report "normal" WBC results and because Brian's results were within the target range through July 20, 1983, the apparent absence of reporting is not a basis for finding negligence. Similarly, the missed WBCs prior to July 20 are

During the trial, plaintiff's counsel repeatedly exceeded the scope of the Court's order limiting the issue of negligence. In particular, plaintiff's counsel prejudicially mischaracterized the nature of the case in his opening statement by alleging a history of negligent treatment, stressing the alleged misdiagnosis of Brian's underlying condition, referring to a "prescription of death" for Imuran, and accusing defendant of illegally prescribing narcotics for Brian. Defendant moved for a mistrial after plaintiff's counsel's opening statement, arguing that it engendered an insurmountable prejudice against the defendant. The Court denied defendant's motion in the interest of economy and the hope that proper instructions could cure the prejudicial effect of plaintiff's counsel's remarks.

At the trial, plaintiff offered the testimony of two expert witnesses, Dr. Goldstein who testified and Dr. Smith whose deposition was read into the record. Dr. Goldstein testified that, in his opinion, defendant violated the relevant standard of care in failing to adhere to the monitoring schedule and to ensure that a WBC was done in August. Dr. Smith, on the other hand, refused to comment on any alleged breach of the standard of care. Both Dr. Goldstein and Dr. Smith gave the opinion that the Imuran, rather than Brian's underlying illness, caused his pancytopenia and death. Neither expert could give an opinion as to when the final white blood cell drop occurred. Dr. Smith stated that the drop "could have been any time in the course of use." In addition, both doctors conceded that it was unusual for the white blood cell count to drop permanently and admitted that they were unaware of a case of a permanently suppressed white blood cell count due to Imuran in medical literature. Neither of plaintiff's experts could give a prognosis for Brian's underlying illness. In contrast, defendant's three experts gave the opinion that Brian's underlying illness, and not the Imuran, caused his death.[4] Defendant's experts found no violation of the standard of care and opined confidently that the missed WBC did not contribute to Brian's death.

Defendant's counsel moved for a directed verdict at the close of plaintiff's evidence and again at the close of all the evidence. The Court denied both motions and sent the case to the jury. The jury found in favor of the plaintiff and awarded her $175,000.00 on the survivorship claim and $175,000.00 on the wrongful death claim.

### Discussion

The same standard governs motions for judgment n.o.v. as motions for directed verdict. *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 827 (D.C.Cir.1988), *cert. den.*, —— U.S. ——, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989); *Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339, 342 (D.C.Cir.), *cert. den.*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). The Supreme Court has stated repeatedly that the mere existence of "some" evidence to support a jury verdict does not preclude the entry of summary judgment or a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* 106 S.Ct. at 2515. "Judgment n.o.v. is proper only if, viewing the evidence in the light most favorable to the [nonmoving party] and giving him the advantage of every fair and reasonable inference that the evidence may permit, there can be but one reasonable conclusion drawn." *Richardson*, 857 F.2d at 827.

not relevant because plaintiff took Brian to other doctors for tests during that time and because the July 20 WBC was normal. Thus, even if failing to follow the schedule prior to July 20 did violate the standard of care, there was no evidence that it had any adverse effect on Brian's condition.

4. Plaintiff decided against permitting an autopsy, and to this day the true nature of Brian's illness remains unknown.

In order to prevail on a motion for judgment n.o.v., a defendant must demonstrate that the plaintiff failed to produce evidence sufficient to support a reasonable finding on one or more elements of his claim. In a medical malpractice action, plaintiff must establish three elements: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury. *Morrison v. MacNamara*, 407 A.2d 555 (D.C.App.1979). Defendant's post-trial motion, therefore, raises the narrow question whether plaintiff provided sufficient evidence for the jury to find by a preponderance (1) that the defendant's failure to monitor Brian's white blood cell count in August 1983 violated the applicable standard of care and (2) that the missed WBC caused Brian Forman's last illness and death.

Plaintiff did not present any evidence to support a finding that the missed WBC in August caused or contributed to Brian's death. Plaintiff's experts testified that the Imuran caused the serious drop in Brian's white blood count. However, they refused to give an opinion regarding when the drop occurred. Dr. Smith conceded that the drop in Brian's blood count could have been very sudden. Plaintiff's experts did not and could not express an opinion regarding what a WBC in August would have revealed nor could they give an opinion regarding why the blood count did not return to normal after the Mt. Sinai doctors (who, rather than defendant, had put Brian on Imuran originally), discontinued the Imuran. Thus, plaintiff's expert testimony es-tablished a causal connection between Brian's death and the Imuran itself but not between his death and the missed WBC. Even giving plaintiff the benefit of all reasonable inferences based on her evidence, there is no basis to find that, "but for" the missed WBC, the Imuran would not have had the identical effect. Thus, there was no evidence from which the jury reasonably could have found that the missed WBC caused or contributed to Brian's death.

Even if there were sufficient evidence to support a finding that the missed WBC caused Brian's death, judgment n.o.v. would be appropriate in this case. The only evidence that the defendant violated the relevant standard of care was Dr. Goldstein's expert testimony (which, like that of plaintiff, was inconsistent with his testimony in the New York trial against the Mt. Sinai defendants). There was not an adequate factual basis for that opinion, however.[5] Rule 703 of the Fed.R.Evid. governs expert opinion testimony and allows an expert to base an opinion on any facts of "a type reasonably relied upon by experts in the particular field." Although Rule 703 was intended to liberalize the use of expert testimony, "it was not intended ... to make summary judgment impossible whenever a party has produced an expert to support its position." *Richardson,* 857 F.2d at 829 (quoting *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir. 1977)). A court may "look behind" expert testimony to determine whether it has an adequate factual or scientific foundation. *Richardson,* 857 F.2d 829.[6]

---

**5.** Plaintiff maintains that defendant did not raise the issue of the adequacy of plaintiff's expert testimony in his motions for directed verdict and therefore cannot pursue the issue now. Defendant argued in support of his motions for directed verdict that plaintiff had not presented sufficient evidence of either negligence or causation to support a jury verdict. That argument clearly challenged the adequacy of plaintiff's experts' opinions, therefore, defendant can reassert the issue in favor of judgment n.o.v.

**6.** The *Richardson* court addressed expert testimony on the issue whether the drug Bendectine caused plaintiff's birth defects in a product liability action. *Richardson,* 857 F.2d at 829.

Plaintiff's expert testified, contrary to the entirety of medical writing on the subject, that Bendectine did cause birth defects. *Id.* at 831. The *Richardson* court examined the studies underlying plaintiff's expert's opinion and determined that they did not provide adequate certainty to support a jury finding of causation. *Id.* at 830–31. The Court's examination of the expert testimony in this case clearly focuses on a different form of factual inadequacy than the *Richardson* court addressed. *Richardson,* however, is important for the principle that the court may examine the adequacy of the facts underlying an expert's opinion in ruling on a motion for judgment n.o.v.

Dr. Goldstein based his purported opinion that defendant violated the standard of care on the monitoring schedule and the fact that it called for a monthly WBC in August which was not performed. In reaching this opinion, however, Dr. Goldstein discounted several significant facts that negate an inference of negligence. First, plaintiff herself was well aware of the schedule and the importance of monitoring Brian's white blood count. In addition, plaintiff did not take Brian to the defendant consistently. During the Imuran treatment she often took him to Mt. Sinai, where the treatment was initiated, and to Fairfax Pediatric Associates. Even before the Imuran treatment, plaintiff relied heavily on the doctors at Mt. Sinai and often took Brian from Washington to New York for treatment. Despite these facts, Dr. Goldstein opined that defendant should have made certain that plaintiff came to him for all the WBCs and that defendant should have made some alternative provision for a WBC during his vacation. Dr. Goldstein's opinion implicitly charges a doctor with the duty to make sure that a patient comes to the office for treatment. Furthermore, the opinion assumes a duty to provide alternative arrangements and to make the patient comply when the doctor is on vacation or otherwise not available. The Court is unwilling to recognize such a rule because it would set an impossible standard. Even accepting Dr. Goldstein's opinion that the monitoring schedule established the standard of care, the Court holds that defendant's obligation consisted of informing plaintiff of the need for monitoring and performing the tests with plaintiff's cooperation. Defendant was not obliged to force plaintiff to bring Brian to the office for WBCs. A doctor cannot compel a patient to come to the office for treatment, nor can a doctor force a patient to follow his recommendations outside the office. In fact, few patients would appreci-

ate the type of paternalistic intrusiveness plaintiff's proposed rule requires.

Plaintiff conceded that defendant never told her to discontinue the WBCs although he told her in June that monthly WBCs would suffice.[7] Given plaintiff's active involvement in Brian's medical treatment and the fact that she regularly took him to several different doctors, assuredly it was reasonable for Dr. Pillsbury to expect her to arrange for a WBC during his vacation. Certainly no one would argue that plaintiff was remiss in her care for Brian at any time. To the contrary, her efforts to solve the medical problems of her congenitally ill son were extraordinary. Her conscientious care, however, does not inculpate the defendant. Dr. Goldstein conceded that a doctor is permitted to structure follow-ups according to the intelligence and responsibility of the patient, yet he failed to give defendant the benefit of such considerations in giving his opinion.

For the above reasons, the Court finds that plaintiff failed to show any deviation from the relevant standard of care on defendant's part. In the alternative, if there was sufficient evidence from which the jury could conclude that defendant was negligent, that finding is so contrary to the weight of the evidence that a new trial would be warranted. The verdict in this case was clearly the product of sympathy and confusion engendered in part by plaintiff's counsel's frequent violation of this Court's pretrial ruling limiting the scope of the alleged negligence. Counsel's opening statement prejudicially led the jury to believe that the case involved numerous negligent acts, thereby clouding the issues of negligence and causation. Furthermore, Counsel's repeated questioning outside the scope of the Court's ruling compounded the initial prejudice. Thus, in the alternative to judgment n.o.v., a new trial would be warranted in this case.

7. Plaintiff contended at trial (in violation of the Court's limiting Order) that Dr. Pillsbury should have continued the weekly WBCs and therefore was negligent in changing to monthly WBCs. Plaintiff's own evidence established that the transition to monthly WBCs when Brian's white blood cell count became stable was in accordance with the Mt. Sinai instructions and, therefore, did not violate the standard of care.

*Conclusion*

Plaintiff did not provide sufficient evidence to support a finding that the missed WBC contributed to Brian's death. Plaintiff's experts linked the permanent drop in Brian's white blood count to the Imuran, but failed to establish the necessary causal connection between the missed WBC and the ultimate consequences. Furthermore, plaintiff's expert's opinion that defendant violated the standard of care in failing to perform a WBC lacked an adequate factual basis. Therefore, plaintiff did not provide a sufficient evidentiary basis to support the finding that defendant was negligent. For these reasons, defendant's motion for judgment n.o.v. and, in the alternative, for a new trial are granted.