Donald J. MATTHEWS, Sr., as Personal Representative of Thomas E. Matthews, Petitioner,

v.

SECRETARY OF the DEPT. OF HEALTH AND HUMAN SERVICES, Respondent.

No. 88–15V.

United States Claims Court.

Oct. 25, 1989.

·Anthony C. Roth, Washington, D.C., for petitioner. William L. Gardner, Washington, D.C., of counsel.

Michael P. Milmoe, Dept. of Justice, Washington, D.C., with whom was Barbara Hudson, Dept. of Health and Human Services, Washington, D.C., for respondent.

## OPINION [1]

ROBINSON, Judge.

### Litigation Background

This is an action for compensation for the vaccine-related injury and death of Thomas Edmund Matthews (hereinafter Thomas) brought on September 22, 1988 by his father, Donald J. Matthews, Sr., (hereinafter petitioner) as legal representative of Thomas, under the National Childhood Injury Program, 42 U.S.C.A. § 300aa–10 *et seq.* (West Supp.1989) (hereinafter Act or Vaccine Act). After respondent filed a conditional answer and the parties engaged in

the mandatory settlement conference, Special Master LaVon French issued a pretrial scheduling order (hereinafter Order) on April 4, 1989. The Order required the parties to complete discovery by April 26, 1989. The court had previously granted respondent's discovery request for the issuance of a subpoena to ascertain if further medical records exist relating to the hospitalization and autopsy of Thomas.[2] February 24, 1989 Order at p. 2.

The Order required each party to file with the court on or before May 3, 1989, a list of exhibits which the party intended to offer at the hearing. The Order stated that a failure to comply with its requirement "shall result, absent a showing of a compelling reason for the failure, in the exclusion of the exhibit at the hearing." [3] It is uncontested that respondent did not comply with this Order.[4] At the hearing on May 16, 1989 in Washington, D.C. before Special Master French, respondent disclosed for the first time the nature of its defense and sought the admission of an affidavit and certain exhibits, none of which had been listed or disclosed pursuant to the Order. Respondent did not then provide, and has not since provided, petitioner with a copy of these documents.

Several weeks prior to the hearing, Respondent furnished to petitioner a copy of the VICP Medical Review Case No. 88–15V (hereinafter Medical Review) prepared by Dr. Cynthia McCormick, an employee of respondent. When offered by respondent's counsel at the hearing, petitioner objected to its admissibility under the Hearsay Rule and respondents' noncompliance with the Order. The Special Master took the matter

---

1. This opinion may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this opinion, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this opinion there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

2. Prior to the May 16, 1989 hearing of petitioner's claim, respondent made no request that petitioner and his wife undergo genetic testing and made no request for extension of discovery.

3. Order at ¶ 8.

4. The respondent's other violations of the Order are discussed elsewhere in this Opinion in connection with petitioner's sanctions motion filed pursuant to RUSCC 16(f).

of its admissibility under advisement.[5]

The Special Master filed her Report and Recommendation of Judgment (hereinafter Report) on July 13, 1989. The Report rejected respondent's contention that Thomas' injury and death were due to factors unrelated to the administration of the vaccine and found that petitioner had shown by a preponderance of the evidence that they were caused by administration of the diphtheria, pertussis and tetanus (hereinafter DPT) shot. The Report rejected certain evidence offered by the parties as inadmissible under applicable rules of evidence. The Report recommended that judgment be entered for petitioner in the amount of $280,000, consisting of $250,000 as an award to the estate of the deceased to compensate for the death of Thomas, $21,524.58 for attorneys' fees and $8,475.42 in costs.

This action is now before the court on respondent's objection to the Report filed August 2, 1989, which seeks a rejection of the findings of the Report and requests additional discovery; on petitioner's motion for an order awarding sanctions pursuant to RUSCC 16(f) against the Secretary of the Department of Health and Human Services for his refusal to obey the Special Master's Order of April 4, 1989; and on petitioner's supplemental itemized request for reasonable attorneys' fees and other costs filed on August 3, 1989. The parties have completed all briefing relating to these pleadings. Oral argument pursuant to this court's order was held on September 15, 1989.

After careful consideration of the entire record, including the testimony of petitioner's witnesses, exhibits, and all other evidence properly submitted, for the reasons hereinafter set forth, the court rejects all of the respondent's objections to the Report; affirms and adopts the Report and Recommendation of Judgment; denies respondent's request for additional discovery; denies petitioner's motion for sanctions pursuant to RUSCC 16(f); and denies petitioner's supplemental itemized request for attorneys' fees and other costs.

### Thomas' Medical History [6]

The record shows that Thomas was born on November 8, 1954 in Philadelphia, Pennsylvania to Donald J. Matthews, Sr. and Eleanor R. Matthews, the full term product of an uncomplicated pregnancy and delivery. The evidence conclusively shows that Thomas developed normally during the first few months of his life.[7]

Thomas was given his first DPT vaccination on April 4, 1955, with no evidence of an adverse reaction. After receiving a second DPT shot on April 25, 1955, during the night of the 25th and the morning of the 26th, Thomas cried almost non-stop in a hard, piercing, shrill cry which he had never before made. Despite Mrs. Matthews' efforts, Thomas was inconsolable. Parts of his body became pale blue in color, most noticeably his lips turned blue and his complexion was pale. Although Thomas' color returned to normal on the morning of April 26, his whole body quivered and shook for some time, especially his arms and legs, and he was unresponsive to external stimuli. Later, when Thomas suffered a massive seizure he was rushed to the hospital.[8]

---

5. Hearsay is not admissible except as provided by "the rules of evidence or by other rules prescribed by the Supreme Court or by Act of Congress." Fed.R.Evid., Rule 802.

6. The court has set forth in this Opinion only those facts which are directly pertinent to its decision on the issues presented. The facts and conclusions recited in the Report not restated in this Opinion are incorporated herein by reference.

7. For example, Thomas interacted well with his family members and other children, he reacted normally to external stimuli, he laughed, cried, ate, slept, and in all respects acted as a typical infant. The medical records kept by Thomas' pediatrician, Dr. Louis E. Brogan, support this finding.

8. When Thomas continued to be listless and unresponsive, Mr. and Mrs. Matthews called Dr. Brogan on April 27, but Dr. Brogan did not examine Thomas at that time. This condition continued through April 28. On the morning of April 29, Thomas began quivering and shaking again. When his parents could not stop this condition, they again called Dr. Brogan. He told them to watch Thomas, but did not see him.

During the year following the April 25 DPT shot, Thomas suffered more than 50 seizures, his normal development stopped and his behavior changed. He did not respond to stimuli, recognize his parents, react to his siblings, or play or laugh. He would "just lay." Although Thomas was well cared for and often hospitalized at various stages until his death, he did not improve. He suffered countless seizures, remained a complete bed patient, suffered developmental arrest, was constantly maintained on medication, could not be fed adequately and at times required tube feeding. He died on June 11, 1961. He was six years old at the time of his death, but had the size and weight of a three-year-old.

A pathologist performed an autopsy on Thomas after his death which included an examination of Thomas' brain. That examination did not note any abnormalities associated with any genetic disease such as Krabbe's or Schilder's disease or other demyelinating diseases that would be inconsistent with a finding that the DPT shot caused Thomas' injury and death.

### Respondent's Objections to The Special Master's Report

The respondent's objections will be considered under the statutory requirements of the Vaccine Act.[9] In this case, only the 3rd element, causation, is contested. The Act contains an Injury Table (hereinafter Table) setting forth a list of vaccines, injuries and time periods of initial manifesta-

tion or onset of injuries. If the Table's conditions are satisfied, a presumption arises that the injury was caused by the particular vaccine or vaccines administered, in this instance the DPT shot. Thus, a finding of causation is deemed to exist for those injuries listed in the Table which occur within the time period set forth in the Table.

■ To meet its burden of proof and establish a right to recovery, a petitioner need only demonstrate by a preponderance of the evidence that the conditions of the Table are satisfied.[10] § 300aa–13(a)(1)(A). In short, a claimant meets its ultimate burden of proof if it convinces the court upon all the evidence that the facts asserted "are more probably true than false." *See, Burch v. Reading Co.*, 240 F.2d 574, 579 (3rd Cir.1957), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957) (footnote omitted).[11] Once a petitioner has met the "Table" requirements, the burden shifts to the respondent to prove, by a preponderance of the evidence, that the injury was due to an "unrelated factor." § 300aa–13(a)(1)(B). The presumption that the shot caused the injury becomes irrebuttable if the respondent fails to meet this burden. § 300aa–14(b)(3).

■ Respondent's concession at the hearing that petitioner had demonstrated all of the Table requirements gave rise to the presumption of causation, the only aspect of petitioner's compensation claim which respondent contests. Thus, respon-

---

On April 30, Mrs. Matthews observed Thomas suffer a massive seizure or convulsion, more severe than any of the previous shaking and quivering. She rushed him to Misericordia Hospital in Philadelphia, where he was admitted and remained as a patient until May 17. He was hospitalized at various other times both at Misericordia and St. Christopher's Hospital.

**9.** These requirements are:
 1) receipt of a vaccine set forth in the Vaccine Injury Table;
 2) receipt of the vaccine in the United States or in its trust territories;
 3) the vaccine caused, or significantly aggravated, an illness, disability, injury or condition;
 4) the first symptom of which occurred within the time period set forth in the Vaccine Injury Table;

 5) the residual effects of the illness, disability, injury or condition lasted for more than six months or resulted in death following administration of the vaccine; and
 6) there has been no award or settlement in a civil action for damages for the vaccine-related injury or death.
 § 300aa–11(c)(1)(A)-(E).

**10.** The standard of proof, as stated in *Morris v. United States*, 171 Ct.Cl. 220, 228 (1965), is *not* to produce "clear and convincing evidence," but "evidence which would lead the trier of facts to conclude, based thereon, that the facts to be proven are ... probably true." *Raymark Industries, Inc. v. United States*, 15 Cl.Ct. 334, 343 (1988) (emphasis added).

**11.** See additional footnote citations, Report, page 9, footnote 6.

dent, to defeat recovery by the petitioner in this case, has the burden of showing by a preponderance of the evidence that Thomas' injury and death were "due to factors unrelated to the administration of the vaccine described in the petition." 42 U.S.C. § 300aa–13(a)(1)(B). It is clear from the legislative history that the burden of establishing the existence of an "unrelated factor" is upon the respondent.[12] 42 U.S.C. § 300aa–14(b)(3)(A).

■ To meet its burden of proof of showing an "unrelated factor," respondent contends that hospital records indicate the possibility of Krabbe's disease or Schilder's disease and that the "treating neurologist's primary diagnosis was that the child had a subcortical encephalopathy." However, the only mention of Krabbe's or Schilder's disease in the entire medical record is a comment by a *resident* physician, Dr. Walter B. Omans, which was subsequently abandoned as a diagnosis by Dr. Edwin R. Abrahamsen. Dr. Abrahamsen's later diagnosis was "that there is a reason to suspect that this may be a post-pertussis vaccine encephalopathy."[13]

Thomas' medical records contain convincing evidence that Thomas' condition was due to the DPT shot and not to Krabbe's or Schilder's disease or any other demyelinating disease.[14] Petitioner's expert witnesses also testified convincingly that Krabbe's disease was not the cause of Thomas' injury and death. Uncontroverted evidence shows that Thomas did not suffer a gradual loss of function, but was entirely normal until he received the second DPT shot. Thereafter, Thomas suffered a sudden and severe encephalopathy and seizures along with a dramatic loss of function. The most probative evidence of this is the hearing testimony of Dr. Charles Kennedy, a highly qualified professor of pediatrics and neurology at Georgetown University. His opinion, based upon his review of all of the medical records, the testimony of Mr. and Mrs. Matthews, and his many years of training and experience, was that it was "very, very likely, virtually a certainty that the immunization played a causal role in what happened to him."[15]

Respondent contends the Special Master erred in finding that the autopsy done on Thomas "ruled out the possibility" of Krabbe's disease and that the pathologist "failed to do a complete autopsy" and "to examine either the brain or peripheral nerve." The medical records, however, show that the pathologist, Dr. Arey, did perform a complete autopsy on Thomas including an examination of Thomas' brain. In fact, the pathologist's report not only contains a discussion of the brain in the protocol, but also a "Brain Note" discussing the pathologist's observation of the brain. The autopsy report notes none of the gross abnormalities of the brain associated with Krabbe's, Schilder's or any other demyelinating disease. In view of Thomas' medical records the pathologist had before him at the time he performed the autopsy, it is reasonable to conclude that he would have noted such obvious abnormalities associated with these diseases. The absence of such notations in the autopsy report does "rule out," by implication, the *possibility* that Thomas suffered from one of these rare genetic diseases.

Next, respondent argues that Thomas' illness progressed gradually and challenges the Special Master's finding that Thomas' course of illness was "not downhill." However, the Special Master's determination that Thomas suffered a sudden loss of function after the second DPT shot is fully

---

**12.** H.R.Rep. No. *99–908, 99th* Cong. 2d Sess. 18, *reprinted in* 1986 U.S. Code Cong. & Admin. News 6344, 6359; see statutory aids to interpretation which provide that if "it is not possible to determine the cause, by a preponderance of the evidence of an encephalopathy, the encephalopathy shall be considered to be a condition set forth in the table." 42 U.S.C. § 300aa–14(b)(3)(B).

**13.** P. Exhibit 15; Report and Recommendation of Judgment at 531, n. 7. Dr. Abrahamsen, M.D., was then a staff physician at St. Christopher's Hospital for Children.

**14.** P. Exhibit 15, 16, 17, 18, 19, 24, 28, 28a, 31 and 32. *See also* Transcript at 96–97, 133–134; Deposition Transcript of Dr. Kevin Geraghty at 21–25.

**15.** Transcript at 96–97.

supported by the evidence. Thomas did not suffer a slow "downhill" illness, which is one characteristic of Krabbe's disease. Based upon the testimony of Mr. and Mrs. Matthews, the medical records and the persuasive testimony of Dr. Kennedy and Dr. Geraghty, the Special Master correctly found "'downhill' does not characterize what happened to Tommy."

The Special Master found that within 72 hours of receiving a DPT shot on April 25, 1955, Thomas suffered three conditions stated in the Vaccine Table: (1) a residual seizure disorder; (2) an encephalopathy; and (3) a hypotonic-hyporesponsive collapse. She then found that Thomas died as a result of the injuries he suffered following the DPT shot. Respondent argues that the Special Master erred in finding that Thomas' death was due to "a vaccine induced hypotonic-hyporesponsive episode leading to death" because studies in which hypotonic-hyporesponsive episodes were reviewed do not document deaths. Petitioner contends that respondent has misstated the Special Master's findings as to the cause of death. The court agrees. It is uncontested that a residual seizure disorder and an encephalopathy can cause death. The petitioner has correctly characterized respondent's argument concerning hypotonic-hyporesponsive episodes as "frivolous."

Respondent's mere speculation regarding causation by an unrelated factor such as Krabbe's disease lacks any persuasive evidentiary support and constitutes a wholly insufficient showing to meet its burden of proof. *See, Burch v. Reading Co.*, 240 F.2d 574, 579 (3rd Cir.1957), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957); *Raymark Industries, Inc. v. United States*, 15 Cl.Ct. 334, 343 (1988). The inescapable conclusion based on petitioner's evidence is that Thomas was injured and later died from the second DPT shot. The court finds that respondent has failed to meet its burden of showing by a preponderance of the evidence that Thomas' injury and death were due to an "unrelated factor." Respondent's failure of proof re-

sulted in an irrebuttable presumption that Thomas' injury and death were due to the DPT shot. The court is of the further opinion that even without the presumption of causation to which petitioner is entitled, petitioner's proof is more than sufficient to establish by a preponderance of the evidence that Thomas' injury and death were due to the DPT shot and that there is not a preponderance of the evidence his injury and death were due to "unrelated factors." § 300aa–13(a)(1).

### The Special Master's Exclusion of the Medical Review and Other Documents

The respondent claims that the Special Master erred in excluding respondent's Medical Review, affidavit and medical/scientific studies because both the Act and its legislative history anticipate that a streamlined process of determining eligibility will be used under the Program and that the traditional rules of evidence should not apply to the Special Master's fact finding process.

■ Respondent contends, in substance, that the Federal Rules of Evidence should be disposed with or loosely applied in order to allow an expeditious handling of vaccine cases and further, to be fair to respondent, the court should allow introduction of respondent's hearsay evidence. It is clear, however, from the Act's claims procedures that Congress had in mind fair treatment of *petitioners*.[16] Obviously, the Act assumes that the court in its administration and interpretation of the Act will be impartial and not unduly restrictive in its application of the Federal Rules of Evidence, but the Act certainly does not mandate favored treatment of the respondent with respect to application of the Federal Rules of Evidence.

Respondent notes the Act's legislative history shows that the Special Master is empowered to "replace" the usual rules of discovery and, while the Special Master

---

**16.** In fact, Congress' intent was to be fair to petitioners even to the extent of awarding "compensation to some children whose illness is not,

in fact, vaccine-related." H.R.Rep. No. 99–908, 99th Cong., 2d Sess. 18, *reprinted in* 1986 U.S. Code Cong. & Admin.News 6344, 6359.

may compel any testimony or appearance, "neither party is given power to cross-examine witnesses, file interrogatories or take depositions." [17] However, this language clearly refers to applicable discovery rules and not to the Federal Rules of Evidence. This legislative history suggests only that Congress intended to provide the Special Master with discretionary powers beyond those accorded in the Federal Rules of Civil Procedure "to control cross-examination of witnesses, file interrogatories or take depositions." [18] However, the Federal Rules of Evidence apply to the U.S. Claims Court. In fact, Vaccine Rule 43(a) specifically recognized this fact in stating that testimony "shall be taken orally unless otherwise provided ... by the Federal Rules of Evidence." [19]

■ Respondent also contends that its evidence should have been admitted because "the court shall consider ... any ... medical judgment ... which is contained in the record." [20] Respondent concludes from this statement that "the only guideline [is] relevance" and "the Court should freely admit and consider everything" including respondent's proffered hearsay statements. Further, respondent contends that the "rules of evidence are principally designed to protect the untrained fact-finder" and "necessarily are of much less importance when the fact finder is a lawyer." The Federal Rules of Evidence apply in both jury and non-jury cases. They are principally designed to treat the litigants fairly and impartially. All parties are required to comply with the rules whether or not the fact finder is a lawyer. Under the respondent's interpretation that relevancy should be the only guideline, the court would be required to admit voluminous evidence having little or no probative value which could burden the record and confuse the issues. The court's job of sifting through such evidence to try to determine its trustworthiness and what, if any, weight to give it would become much more difficult and time consuming. The Special Master properly exercised her discretion under the facts of this case to control the record's scope and exclude respondent's evidence offered in contravention of the Federal Rules of Evidence.

Respondent argues that rejection of its evidence sets a precedent leaving HHS with no realistic option in future cases but to either appear and testify as to why entitlement under the Act is not warranted or permit "time-consuming and expensive depositions of HHS's witnesses in every contested case." The respondent chose to vigorously and in adversarial fashion contest an award of compensation in this case. It did so before the Special Master and on appeal to this court. That decision necessarily involved a determination of what resources were available to respondent to oppose an award and how to allocate those resources in the most efficient manner. A great deal of time and effort has been expended by respondent in this opposition. Much of this effort could have been avoided had Dr. McCormick simply been made available for cross-examination, but respondent chose for "policy reasons" not to permit petitioner an opportunity to examine Dr. McCormick concerning the basis for her expert opinion testimony, or to answer written questions. Further, respondent could have submitted Dr. McCormick's affidavit in conjunction with a motion for summary judgment if otherwise appropriate under RUSCC 56. One or more of these alternatives might have established a sufficient degree of reliability to permit admission of respondent's hearsay evidence. The Special Master's repeated warnings to respondent to consider all reasonable alternatives to in-court testimony were disregarded. Respondent's participation in

---

17. Objection at 8, quoting H.R.Rep. No. 99–908, 99th Cong., 2d Sess. 16–17, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6357–58.

18. *Id. See also* Vaccine Rule 26(b).

19. Had the Special Master admitted the respondent's hearsay evidence and ruled against peti-

tioner by disallowing the claim based upon such evidence, the Special Master would have ignored the clear intent of Congress as revealed in the cited legislative history.

20. 42 U.S.C. § 300aa–13(b)(1)(A).

the proceeding was not limited by the Special Master in any way. To the contrary, she apparently sought to assist the respondent with its case by suggesting that she would allow Dr. McCormick to testify by phone.

■ The Order prescribed that a failure to comply "shall result, absent a showing of a compelling reason for the failure, in the exclusion of the exhibit at the hearing." The Order applied to both parties. Respondent has never given any such reason for its failure to comply with the Order. All of petitioner's exhibits were properly excluded by the Special Master for this reason alone.

Moreover, when respondent sought admission of its affidavit and exhibits, it did so without first providing petitioner with copies. Petitioner's Response states that it has never "to this day" received copies of these documents from respondent. It is patently unfair and prejudicial to petitioner to admit them because if admitted, the petitioner would have had no opportunity to present any effective response. The harm to petitioner in admitting these documents needs no further explication. The Special Master in her broad discretion may exclude such evidence because its probative value is substantially outweighed by prejudice to the petitioner. She did not err in excluding these documents in this case.[21] *See* Federal Rules of Evidence 403.

In summary, the respondent's evidence was properly excluded because it was in direct violation of the Order. Further, since the Vaccine Act provides no exception to the Hearsay Rule, there is no applicable exception within the Federal Rules of Evidence, and there is no other applicable Supreme Court rule or statute allowing admission of the respondent's proffered evidence, such evidence was properly excluded as inadmissible hearsay. *See* Federal Rules of Evidence, 801(c), 802, 803(18) and (24), 804(a), 804(b)(5).[22] Finally, there is an inherent inequity in respondent's argument. The petitioner was required to present his case in accordance with the Order, the Vaccine Rules, and RUSCC. It would be grossly unfair to petitioner to allow respondent to totally disregard the Order and the Vaccine Rules and thereby obtain consideration of its prejudicial evidence while requiring strict adherence by petitioner to the Order and the Rules. For all of these reasons the court finds that the Special Master did not err in excluding respondent's evidence.

The respondent relies upon *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823 (D.C.Cir.1988) to support its contention that when scientific literature contradicts the expert testimony of an expert witness, the scientific literature is entitled to greater weight. *Richardson* is clearly distinguishable from the facts of this case for the reasons assigned by petitioner in its response and is also inapposite.[23]

21. The court has reviewed in detail all of the respondent's excluded evidence including Dr. McCormick's affidavit and exhibits. If the court is wrong in its affirmance of the Special Master's rulings excluding this evidence under the Federal Rules of Evidence and consideration should have been given by this court to this evidence, and presumably also to petitioner's rebuttal evidence in Petitioner's Exhibit No. 33, the court, nevertheless, is convinced that the court's decision to affirm the Report would be unaffected by such consideration. When the entire record is carefully considered, including all the excluded evidence, the court would still find that the petitioner has more than met its ultimate burden of proof of showing by a preponderance of the evidence that Thomas' injury and death were attributable to the DPT shot. This is particularly so because of the exceedingly small weight this court would be inclined to attribute to respondent's expert opinion evidence which was untested by cross-examination

or other assurances of validity and truth. In addition, the conclusion or judgment of Dr. McCormick regarding causation, even if considered a part of the record by the court, is by no means binding upon this court. If her opinion evidence is evaluated in light of the entire record and the proven course of Thomas' injury, that evidence would be accorded almost no weight by this court. *See* § 300aa–13(b)(1).

22. All other arguments made by respondent for admission of this evidence under the Federal Rules of Evidence not specifically addressed herein are also found to be lacking in merit for the reasons stated by petitioner in its brief.

23. Respondent cited no studies to support its argument. It is assumed that respondent's reliance upon *Richardson* is predicated upon respondent's excluded exhibits. Since that evidence is not before the court *Richardson* is inapposite. In any event, *Richardson* does not

### Respondent's Request For Enzyme Testing

■ Respondent contends that the Special Master erred in not requiring additional discovery relating to genetic testing of petitioner and his wife to determine whether they were carriers of a recessive gene associated with Krabbe's disease. Respondent requests in its objection that this court complete the record by ordering lysosomal enzyme testing on Thomas' parents.

All discovery had to be completed by April 26, 1989. The respondent's first mention of genetic testing was during the hearing. Respondent made no formal motion for leave to reopen discovery at the hearing nor has it attempted to show good cause for its failure to timely seek such discovery.

Moreover, delay for the sole purpose of genetic testing would have been particularly inappropriate when such testing would be inconclusive. Contrary to respondent's assertions, petitioner's evidence, when coupled with respondent's admissions *in camera* and during oral argument, shows that such testing would *not* resolve the medical issues in this case. If these tests showed that both petitioner and his wife were carriers of a recessive trait associated with Krabbe's disease, there is only a 25% chance that Thomas received the recessive genes necessary to develop Krabbe's disease and a 75% chance that he did not. On the other hand, if the tests showed either petitioner or his wife was not a carrier of the genetic trait associated with Krabbe's disease, respondent's conjecture that Thomas suffered from Krabbe's disease would be conclusively rebutted.[24] It would be impossible for this court to find on the basis of a 25 percent chance, assuming a result in accord with respondent's contention, that the respondent had met its "preponderance of the evidence" burden of showing causation by an unrelated factor.

Finally, respondent has not sought under Claims Court Rule 35(a) to obtain issuance of a discovery order requiring physical examinations of petitioner and his wife.[25] It is doubtful that this court has the power to order petitioner's wife to submit to such a genetic test since she is not a party in this litigation. Assuming that this court were to issue a valid order requiring petitioner to undergo the test, petitioner's test results would be of no probative value. In summary, petitioner's evidence confirms the inconclusive nature of the testing respondent advocates. These facts totally justify the Special Master's action in not requiring any genetic testing.[26] This court finds that the respondent has failed to show that genetic testing of petitioner and petitioner's wife is warranted. Respondent's request that this court order additional discovery for this purpose is denied.

### Petitioner's Motion for Order Awarding Sanctions

Pursuant to RUSCC 16(f), petitioner seeks an additional $15,556.33 in costs for petitioner's reasonable attorney's fees as sanctions against respondent for its refusal to obey the court's April 4, 1989 Order.

The Order was explicit, established a time table for discovery, and required the parties to list and exchange all exhibits to be used at the hearing except for those to be used for impeachment. The Order, among other things, required the parties to exchange a final list of names and addresses of witnesses (including expert witnesses), except those to be used for impeachment; to disclose all contentions of applicable facts and law; and to exert diligent efforts to stipulate and agree to facts. The Order also required the parties to file cer-

---

require that an expert witness conduct or publish systematic studies or critique such studies before he is qualified to render an opinion. To the extent that this case is a "battle of experts," *Richardson* is inapplicable.

**24.** Petitioner's response, page 28, and related exhibits.

**25.** RUSCC 35(a) provides that the court may order discovery of the physical condition of a party (*i.e.,* petitioner, but not other members of petitioner's family) only upon a motion for good cause shown.

**26.** The "suggestion" for genetic testing also directly violated the Special Master's Order.

tain documents with the court on May 3, 1989. Order at 6–10.

Petitioner argues that respondent decided in April not to comply with the Order, but sought no modification of the Order, even though petitioner was willing to agree to a reasonable modification or an extension of time for compliance. It is not disputed that petitioner complied with the Order. At the pretrial meeting, petitioner provided respondent with copies of its documents, but respondent provided no materials to petitioner. Respondent stated at the May 9 meeting, however, that it would call no witnesses and would offer only one document, the Medical Review. It is uncontested that petitioner made a conscientious effort to comply with the requirements of paragraph 9 of the Order that the parties file a Joint Memorandum Regarding Stipulations, but was unable to obtain respondent's cooperation in filing this document. Thereafter, petitioner filed its Statement of ·Issues of Fact and Law in accordance with paragraph 10 of the Order, again only after it could not obtain respondent's cooperation with regard to this filing requirement.

Although respondent at the pretrial meeting refused to stipulate to petitioner's statements of fact and law it later conceded almost every statement in petitioner's factual and legal contentions.

At commencement of the hearing, having not complied with the Order's requirements regarding disclosure and stipulations of fact and law not in dispute, respondent conceded for the first time that petitioner had satisfied the conditions stated in the Injury Table and that petitioner was entitled to the presumption of causation notwithstanding its prior contrary position set forth in the Medical Review. Petitioner presented its case including the evidence it had prepared relating to causation. Respondent then sought to introduce Dr. McCormick's affidavit and related medical/scientific exhibits not previously dis-

closed and in conflict with counsel's prior statement that only the Medical Review would be offered. Its proffer was made without offering copies of these exhibits to petitioner or the court. The Special Master deferred ruling upon the admissibility of the Medical Review. She later denied admitting it, but ruled at the hearing that Dr. McCormick's affidavit and related exhibits were inadmissable.[27]

The petitioner seeks an award of attorneys' fees as a monetary sanction pursuant to RUSCC 16(f) because the above recited facts show that the respondent failed to obey a scheduling or pretrial order without substantial justification, and because other circumstances are not present which would make an award of expenses unjust. The attorneys' fees and expenses sought relate to (1) those incurred in complying with the court's Order; (2) those resulting from respondent's refusal to disclose the true nature of its defense; and (3) those due to respondent's failure to timely appear at the May 16 hearing.

Respondent maintains that the petitioner should have objected to respondent's conduct before the Special Master under the Vaccine Rules 11 and 16, and that he waived his rights to seek sanctions by failure to do so in timely fashion. Respondent contends that petitioner was not prejudiced by respondent's conduct since the court found in his favor; that all expenses incurred were necessary for him to prove his case; and finally, that since petitioner in any event had to comply with the Order, petitioner's expenses in complying with that Order were not attributable to respondent's actions or inactions.

■ Rule 16(f) authorizes the court to sanction a party for not complying with this court's orders. Among other just sanctions, it allows the award of reasonable expenses, including attorney's fees.[28]

---

27. This court has already determined in this opinion that these evidentiary rulings were fully justified and in accordance with the Vaccine Act, its legislative history, and the Federal Rules of Evidence.

28. Rule 16(f) provides:

If a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference, or if a party or party's attorney is substantially unprepared to participate in the conference, or if a party or par-

RUSCC 16(f) applies to the respondent since it occupies the same footing as other litigants when it comes before a court. *Bradley v. United States,* 866 F.2d 120, 126 (5th Cir.1981) (footnote omitted); *Lindsey v. United States,* 693 F.Supp. 1012 (W.D.Okla.1988); *Daitz Flying Corp. v. United States,* 4 F.R.D. 372, 373 (E.D.N.Y. 1945). This court has broad discretion under Rule 16(f) to impose a sanction where the fault lies. *In re Baker v. Rivair Flying Service,* 744 F.2d 1438, 1440–41 (10th Cir.1984), *cert. denied,* 471 U.S. 1014, 105 S.Ct. 2016, 85 L.Ed.2d 299 (1985); *M.A. Mortenson Co. v. United States,* 15 Cl.Ct. 362 (1988).

■ Court orders cannot simply be ignored. They must be obeyed on time and in full, absent a timely request for enlargement of time or suspension of an order or for a stay pending appeal. *White Mountain Apache Tribe v. United States,* 5 Cl.Ct. 288, 295 (1984).

■ Petitioner was not required to seek sanctions before the Special Master or forever lose his right to such sanctions. To the contrary, neither the vaccine rules nor this court's rules require a waiver of a petitioner's right to seek sanctions before this court merely because a motion for sanctions was not submitted to the Special Master. This court finds that there has been no such waiver by the petitioner.

■ However, the court is not required to impose sanctions for all violations by the parties. Rule 16(a) contemplates that in its discretion, the court may find under the particular facts presented that a party's non-compliance was substantially justified or other circumstances make an award unjust.

■ There is no doubt the respondent violated the Order. This was a deliberate act which apparently resulted, in part, from a policy decision to seek suspension of all vaccine cases. Undoubtedly respondent's counsel was ill advised in not seeking relief from the Order by an appropriate and timely filed motion. The court cannot find on the facts presented, however, that respondent's non-compliance with the Order calls for a monetary sanction.[29]

Respondent's failure to comply with the court's order constituted surprise which could have been prejudicial to petitioner since petitioner had to be prepared at greater expense to present its case based upon the erroneous assumption that it would have to establish causation. However, petitioner was required to comply with the court's Order notwithstanding respondent's noncompliance. The time petitioner's attorney spent in doing so should not be imposed on respondent. Petitioner also seeks a monetary sanction for the tardiness of respondent's counsel in appearing at the hearing on May 16. The respondent's counsel, of course, should

ty's attorney fails to participate in good faith, the court, upon motion or its own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D). In lieu of or in addition to any other sanction, the court shall require the party or the attorney representing him or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorneys' fees, unless the court finds that the noncompliance was substantially justified or that other circumstances made an award of expenses unjust.

29. The affidavit of respondent's trial attorney Richard Parker attached to the response to petitioner's motion has also been given due consideration in reaching this conclusion. His statement in substance is that (1) the situation the Secretary of HHS faced was novel; (2) some of respondent's defenses initially set forth in its answer were modified as the case progressed toward the hearing; (3) respondent's defense was open and forthright; (4) only shortly before the hearing did respondent realize that the petitioner was entitled to a presumption of causation; and (4) after consultation with Dr. McCormick, respondent's counsel advised the court of this fact "at my first opportunity." The court has no factual ground to reject these sworn statements by Mr. Parker as being untrue or conclude that he, as a duly appointed officer of the court and admitted to practice before this court, acted in bad faith. He correctly notes that the petitioner had the ultimate burden of proof. This necessitated that the petitioner put on all or substantially all of its case in any event, since the Special Master reserved her ruling on the admissibility of the Medical Review, and petitioner could not know during the hearing whether the Medical Review would be received and given weight by the Special Master.

have been on time, but the Special Master could have elected to begin the hearing at the appointed time. Moreover, petitioner did not request that the Special Master commence the hearing on the exact time for which it was scheduled. The resultant delay in this case was relatively brief, amounting to less than thirty minutes. The court denies any award of attorneys fees as sanctions for these two items.

Undoubtedly some additional time was expended by petitioner because of respondent's change of position with respect to the issue of causation and its belated admission at the hearing that the petitioner had met the requirements for a "tabular" claim. The respondent's counsel was obligated to notify the petitioner as soon as the decision was made to change respondent's position regarding causation, because this was a material change of position. However, under the facts here presented the respondent should not be punished for changing its litigation position when such change favored the petitioner. The court finds that no material prejudice to petitioner resulted from this change. Therefore, the court is not required to award attorneys' fees as a sanction to petitioner under Rule 16(f).[30] Petitioner's request for an award of such fees is denied.

### Petitioner's Supplemental Itemized Request for Reasonable Attorneys' Fees and Other Costs

■ In a request filed August 3, 1989, petitioner seeks additional attorneys' fees beyond the $30,000 awarded by the Special Master in the Report. Petitioner seeks a finding that its reasonable attorneys' fees and costs totaled $67,516.72, that the Vaccine Act does not preclude an award under other statutes or court rules for reasonable attorneys' fees and costs not compensated by the Act, and that no reduction of the $30,000 awarded under the Act shall be made unless petitioner recovers more than $37,516.72 in reasonable attorneys' fees and costs under other statutes or court rules.

It is clear that this court may not award attorneys' fees and costs under subsection 1115(b) of the Act beyond the $30,000 limit established in the Act, for the reasons set forth in *Thomas J. Mikulich v. Secretary of the Department of Health and Human Services* 18 Cl.Ct. 253 (1989).

Petitioner, however, argues that notwithstanding the $30,000 limit set forth in subsection 1115(b) of the Act, other statutes and rules may permit recovery of attorneys' fees. He contends that courts have awarded attorneys' fees under the Equal Access To Justice Act. (hereinafter EAJA) to attorneys representing claimants under the Social Security Act (hereinafter SSA) notwithstanding similar statutory limits in the SSA.

Whether the EAJA or any other unnamed or unidentified statute or rule would allow recovery by petitioner of attorneys' fees is not properly before the court. Petitioner is seeking a ruling on this question without having filed a proper motion for an award of attorneys' fees under the EAJA or any other act or rule of this court (except under Rule 16(f) as noted above). The respondent's request is denied.

### CONCLUSION

This court concludes that all of the respondent's objections to the Special Master's Report are lacking in merit. The Report is well reasoned and contains a careful analysis of all the operative facts. Therefore, the court adopts the Report. A copy shall be attached to this opinion. The Report correctly concludes that petitioner met its burden of establishing by a preponderance of the evidence that Thomas' injury and death were due to the DPT shot he received and that respondent has failed to meet its burden of showing by a preponderance of the evidence that his injury and death were due to an "unrelated factor" such as Krabbe's disease. Further, the court denies respondent's request for any additional discovery, denies petitioner's re-

---

**30.** Had the Special Master erroneously accepted into evidence respondent's exhibits offered at the hearing, particularly the affidavit and scientific/medical documents, petitioner could have sought to have them struck as a sanction under Rule 16(f).

quest for sanctions pursuant to RUSCC 16(f), and denies petitioner's supplemental itemized request for attorneys' fees and other costs. All other relief sought by petitioner is denied as moot. The Clerk is directed to enter judgment for petitioner in the total amount of $280,000, consisting of $250,000 in compensation, $21,524.58 in attorneys' fees and $8,475.42 in costs. No additional costs.

## APPENDIX

## REPORT AND RECOMMENDATION OF JUDGMENT

### Filed July 13, 1989

FRENCH, Special Master

This is an action for compensation for the vaccine-related injury and death of Thomas Edmund Matthews brought by his father, Donald J. Matthews, Sr., under the National Childhood Vaccine Injury Program, 42 U.S.C.A. § 300aa–10 et seq. (West Supp.1989) (hereinafter the Vaccine Act). Pursuant to § 300aa–12(c),[1] and Vaccine Rule 18(a), and for the reasons cited below, the undersigned recommends to the assigned Claims Court judge, Judge Robinson, that judgment be entered for petitioner in the amount of $280,000 consisting of $250,000 to compensate for the death of petitioner's son, Thomas Edmund Matthews, and $30,000 in attorneys' fees and other costs.

## BACKGROUND

Petitioner alleges that the events leading to the death of Thomas Edmund Matthews (hereinafter Tommy) on June 11, 1961, were caused by the pertussis component of the diphtheria, pertussis, tetanus (herein-

after DPT) vaccine administered to Tommy on April 25, 1955. A petition was received by the Clerk of this court on September 22, 1988, and deemed filed on November 15, 1988. See General Order No. 20. Petitioner claims compensation of $250,000, costs, and reasonable attorneys' fees pursuant to § 300aa–15 of the Vaccine Act. Respondent denies petitioner's entitlement to compensation. Respondent alleges an alternative cause of Tommy's death—namely a progressive disease, more consistent with Krabbe's disease, Schilder's disease, or another demyelinating condition.

A hearing was held in Washington, D.C. on May 16, 1989. Witnesses appearing for the petitioner were Donald J. Matthews, Sr., Tommy's father; Eleanor Matthews, Tommy's mother; and Charles Kennedy, M.D.[2] The deposition testimony of Kevin C. Geraghty, M.D.[3] was offered and received into evidence on behalf of petitioner. No witnesses appeared on behalf of the respondent.

The issue to be decided is whether petitioner has demonstrated by a preponderance of the evidence that Tommy's death was caused by the DPT vaccine or whether his death was due to other unrelated factors. The court must decide and rule also on the admissibility of certain evidence.

## STATEMENT OF FACTS

The following facts are supported by the record. Tommy was born to Donald J. Matthews, Sr. and Eleanor R. Matthews on November 8, 1954, in Philadelphia, Pennsylvania, the full term product of an uncomplicated pregnancy and delivery. During the first 5½ months, Tommy developed normal-

---

1. This report may contain information that may not be disclosed to a nonparty. See 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

2. Dr. Kennedy is a board certified Diplomate of the American Board of Pediatrics, the American Board of Allergy and Immunology, the American Board of Psychiatry and Neurology, Professor of Pediatrics and Neurology, Georgetown University School of Medicine, and Senior Research Scientist at the National Institute of Mental Health (NIH).

3. Dr. Geraghty is a board certified Diplomate of the American Board of Pediatrics and the American Board of Allergy and Immunology.

ly, as had the Matthews' other four children.[4] Among the things Mr. and Mrs. Matthews recall about Tommy's behavior during the weeks prior to April 25, 1955, are the following:

1) Tommy responded when their other children played with him, enjoyed the attention, followed them with his eyes when they jumped around him, reached for rattles and toys when they were dangled within his reach, and grabbed their ears or other objects when they held him.

Transcript of May 16, 1989 hearing at 35, *Matthews* (No. 88–15V) (hereinafter Tr. at ——).

2) Tommy recognized his parents and siblings and would respond to his father's singing and grab his nose.

Tr. at 58.

3) Tommy responded to tickling and laughed in response.

*Id.*

4) Tommy's mother wrote on her calendar for January 27, 1955 that "Tommy pulled Ginger's hair."

Tr. at 36.

5) Tommy had no feeding or sleeping problems and would coo, and laugh at things.

Tr. at 35.

6) Tommy enjoyed being bathed and would splash the water and grab the wash cloth.

Tr. at 36.

The records of Dr. Louis E. Brogan, Tommy's pediatrician, indicate that Tommy was a completely normal infant prior to April 25, 1955. Petitioner's Exhibit No. 10 (hereinafter P. Exhibit No. ——). On April 25, 1955, Dr. Brogan gave Tommy his second DPT shot in Philadelphia, Pennsylvania. Tommy's first DPT shot was administered on April 4, 1955 without incident.

At the time that he received his second shot, Tommy was in his usual fine health.

However, on the night of April 25–26, 1955, Tommy cried almost non-stop in a hard, piercing, shrill cry, which he had never before made. Tr. at 39 and 59. Despite Mrs. Matthews' efforts through the night, Tommy was inconsolable. In addition to the crying, Tommy was pale and blue in color, with his lips being most obviously blue. Tr. at 40, 59, and 62.

During the morning of April 26, 1955, Tommy's color returned to normal. But, on April 26, 1955, Tommy quivered and his whole body shook a little, especially his arms and legs. *Id.* The quivering and shaking eventually stopped. Mr. and Mrs. Matthews knew that Tommy was sick and was not "normal." Tommy had no fever, and yet he did not seem to respond to external stimuli. Tr. at 40 and 59.

When Tommy continued to be listless and unresponsive on April 27, 1955, Mr. and Mrs. Matthews called Dr. Brogan, but Dr. Brogan was unable to see Tommy. Because Dr. Brogan did not seem overly concerned, Mr. and Mrs. Matthews expected Tommy's sickness to pass. However, Tommy continued to be sick and unresponsive on April 28, 1955. Tr. at 41 and 42.

On the morning of April 29, 1955, Mr. and Mrs. Matthews again saw Tommy quivering and shaking. Tr. at 42 and 60. Because nothing Mr. and Mrs. Matthews did stopped the quivering and shaking, they again called Dr. Brogan. Dr. Brogan told them to continue to watch Tommy, but did not see the child.

On April 30, 1955, while Mr. Matthews was at work, Mrs. Matthews observed Tommy suffer a massive seizure or convulsion, more severe than any of the previous shaking or quivering. Seeing Tommy's eyes "staring out," she picked Tommy up and ran to the neighbors to get a ride to Misericordia Hospital, where Tommy was admitted. Tr. at 43. Tommy was kept in the hospital from April 30 to May 17, 1955.

---

4. A notation by Mrs. Matthews was made on her calendar that Tommy "rolled over on the table" on April 28, 1955. Petitioner's Exhibit No. 11. Because there is no evidence that the notation indicates the first time that Tommy rolled over, it does not support the speculation that Tommy's development may have been delayed. Moreover, even if it were the first time, according to Dr. Geraghty, that fact does not indicate that Tommy's development was abnormally late. Petitioner's Exhibit No. 39 at 24.

Following the April 25, 1955, DPT shot, Tommy developed a severe generalized convulsive disorder, suffering numerous and uncontrolled seizures or convulsions. During 1955 alone, Tommy was hospitalized at Misericordia Hospital from April 30 to May 17, May 26 to May 31, July 4 to July 15, and September 16 to September 22, and at St. Christopher's Hospital for Children from September 26 to October 24 and December 11 to December 20. P. Exhibits No. 3, 16, and 36. In the single year following the April 25, 1955, DPT shot, Tommy suffered more than fifty seizures. P. Exhibits No. 12, 13, 18, and 19.

Following the April 25, 1955, DPT shot, Tommy stopped developing normally and his behavior changed. He was never again the same. Tommy did not respond to stimuli, as he had done before receiving the DPT shot. The children asked, "What's the matter with Tommy?" Tr. at 48. He did not recognize his parents or react to the attention of his siblings. He no longer played; he never laughed; he would "just lay." Tr. at 53 and 74.

Tommy was treated by medical specialists over the balance of his lifetime, but his condition did not improve. There were occasions when the child was tied in an upright position in a chair. But for the most part, Tommy remained a complete bed patient, suffered developmental arrest, was maintained on medication, could not be fed adequately despite excellent care, and required periodic hospitalization and tube feeding. Tr. at 53, 76, and 79; P. Exhibit No. 27. Tommy died on June 11, 1961. Tommy was six years old at the time of death, but had the size and weight of a three-year-old. P. Exhibit No. 28a.

## THE STATUTORY REQUIREMENTS

The National Childhood Vaccine Injury Program provides compensation for injury or death related to the administration of certain vaccines, including the pertussis (whooping cough) vaccine, most commonly administered as part of a series of immunizations known as DPT (diphtheria, pertussis and tetanus).

Petitioner is entitled to compensation if petitioner demonstrates by a preponderance of the evidence the following elements:

1) receipt of a vaccine set forth in the Vaccine Injury Table;

2) receipt of the vaccine in the United States or in its trust territories;

3) the vaccine caused, or significantly aggravated, an illness, disability, injury or condition;

4) the first symptom of which occurred within the time period set forth in the Vaccine Injury Table;

5) the residual effects of the illness, disability, injury or condition lasted for more than six months or resulted in death following administration of the vaccine; and

6) there has been no award or settlement in a civil action for damages for the vaccine-related injury or death.

§ 300aa–11(c)(1)(A)–(E).

In this case, only the third element—causation—is contested. Tr. at 21.

The Vaccine Act seeks to eliminate the difficult individual determinations of causation of injury by defining the conditions which give rise to a presumption of causation. In the Vaccine Injury Table (hereinafter Table), § 300aa–14(a), the Vaccine Act sets forth a list of vaccines, injuries, and time periods of initial manifestation or onset of injuries. If the conditions of the Table are satisfied, a presumption arises that the injury was caused by the DPT shot. A finding of causation is deemed to exist for those injuries listed in the Table which occur within the time period set forth in the Table.

Under the Vaccine Act, a petitioner meets his burden of proof if he demonstrates by a preponderance of the evidence that the conditions of the Table are satisfied. § 300aa–13(a)(1)(A). In *Morris v. United States,* 171 Ct.Cl. 220, 228 (1965), this court held that the preponderance of the evidence standard did not require a petitioner "to produce 'clear and convincing

evidence'...." [5] Instead, the preponderance of the evidence standard is satisfied if the evidence "would lead the trier of facts to conclude, based thereon, that the facts to be proven are ... probably true." *Raymark Industries, Inc. v. United States,* 15 Cl.Ct. 334, 343 (1988). Stated differently, under the preponderance of the evidence standard, a petitioner's burden is "to convince [the court] upon all the evidence before [the court] that the facts asserted ... are more probably true than false." *Burch v. Reading Co.,* 240 F.2d 574, 579 (3d Cir.1957), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957) (footnote omitted).[6] Thus, in reviewing the record as a whole, the court applies the least stringent standard of proof required in civil cases—more likely than not.

Once a petitioner shows by a preponderance of the evidence that the conditions stated in the Table have been satisfied, the burden of proof shifts to the respondent to prove that the injury was due to an unrelated factor. § 300aa–13(a)(1)(B). As defined in the Vaccine Act, an "unrelated factor" does not include an unexplained, unknown, hypothetical, or undocumented cause. § 300aa–13(a)(2)(A). Moreover, if the cause of an encephalopathy (defined as any significant acquired abnormality of, or injury to an impairment of the function of the brain) cannot be determined by a preponderance of the evidence, an irrebuttable presumption exists that it was caused by the DPT inoculation. § 300aa–14(b)(3).

### FINDINGS OF ULTIMATE FACT

The parties have agreed that the only matter to be resolved by the court is whether Tommy's injury and death were caused by the administration of the DPT vaccine or by an intervening unrelated factor. After due consideration, the court finds as follows:

1. Tommy suffered a residual seizure disorder, encephalopathy, and hypotonic-hyporesponsive collapse following the administration of a DPT vaccination on April 25, 1955.

2. The first manifestation or onset of these injuries occurred within three days (72 hours) of the administration of the vaccine.

3. Tommy died as a result of his injuries on June 11, 1961.

4. Since the injury occurred within 72 hours, this is a table case and is entitled to a presumption of causation.

5. The record demonstrates that there is not a preponderance of the evidence that Tommy's death was due to one of the alternative causes argued by respondent, that is, Krabbe's disease, Schilder's disease, or other progressive demyelinating disease.

6. Petitioner is eligible to receive compensation, costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 300aa–15.

### DISCUSSION

The Vaccine Injury Table lists the DPT vaccination as one of the covered vaccinations. For DPT vaccinations, the injuries include "encephalopathy," "shock-collapse" or "hypotonic-hyporesponsive collapse," and "residual seizure disorder" as recognized Table injuries provided the first symptoms of these events manifest themselves within three days (72 hours) from the time of vaccine administration. The Vaccine Act provides the following aids to interpretation:

A petitioner may be considered to have suffered a residual seizure disorder if the

---

**5.** The "clear and convincing standard" of proof is "more stringent" than the preponderance standard of proof. *Gardner v. Wilkinson,* 643 F.2d 1135, 1137 (5th Cir.1981).

**6.** The *Burch* decision was cited with approval by this Court in *Raymark Industries,* 15 Cl.Ct. at 343. *See also Smith v. United States,* 557 F.Supp. 42, 51 (W.D.Ark.1982) *affd,* 726 F.2d 428 (8th Cir.1984) (" 'Preponderance of the evidence' means the greater weight of evidence. It is the evidence which, when weighted with that

opposed to it, has more convincing force and is more probably true and accurate."); *United States v. Kansas Gas and Electric Co.,* 215 F.Supp. 532, 543 (D.Kan.1963) (Preponderance of the evidence "simply means such evidence[,] when considered and compared with that opposed to it [,] which has more convincing force and produces in the mind of the trier of fact a belief that such evidence is more likely true than not true").

petitioner did not suffer a seizure or convulsion unaccompanied by fever ... before the first seizure or convulsion after the administration of the vaccine involved and if—

.    .    .    .    .

(B) in the case of [DPT], the first seizure or convulsion occurred within 3 days after the administration of the vaccine and two or more seizures or convulsions occurred within one year ... unaccompanied by fever ...

§ 300aa–14(b)(2).

There is no evidence in the medical records of any seizure prior to Tommy's vaccination, and both parents testified that none occurred. Tr. at 38 and 58. The first manifestation of seizures occurred on April 26, 1955. Both parents observed Tommy shaking or quivering and jerking his arms and legs on the morning after his vaccination, although they did not recognize the symptoms as seizures. The symptoms continued during subsequent days. On the 5th day Tommy was hospitalized as a result of a grand mal seizure. Dr. Geraghty stated in depositional testimony that the "quivering" reported by the mother "can only be interpreted as early convulsions." P. Exhibit No. 39 at 22–23. Dr. Kennedy draws the same conclusion. Tr. at 97. Dr. Geraghty testified that, in his opinion, Tommy clearly sustained a seizure episode in the first 72 hours and that the child continued to advance into further neurological involvement. P. Exhibit No. 39 at 22–23. Tommy's seizures continued during the remainder of his short life.

The Vaccine Act defines "encephalopathy" and "shock-collapse or hypotonic-hyporesponsive collapse" as follows:

The term "encephalopathy" means any "significant acquired abnormality of, or injury to, or impairment of function of the brain.... Signs and symptoms such as high pitched and unusual screaming,

persistent unconsolable crying ... are compatible with encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy ..."

§ 300aa–14(b)(3)(A).

A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, ... loss of color or turning pale white or blue, unresponsiveness to environmental stimuli....

§ 300aa–14(b)(1).

The symptoms of encephalopathy and hypotonic-hyporesponsive collapse did, in fact, occur within hours of the vaccination. On the night of April 25–26, 1955, Tommy cried all night—not an ordinary cry, but a painful cry—a "wail" that the parents had not heard before. He was pale and his lips were blue. Tr. at 39–40. Dr. Geraghty explained that the "blue fit," or cyanotic spell is typical of DPT reactions in all likelihood because of the endotoxin component of the DTP. The loss of color, the blue lips, the nature of the crying, and the child's subsequent symptoms, indicate, in Dr. Geraghty's words, a neurological insult to Tommy's brain, the most likely retrospective diagnosis being that of a "shock-like episode" or, "more correctly, ... a hypotonic-hyporesponsive episode." P. Exhibit No. 39 at 24. Tommy's adverse reaction, according to Dr. Geraghty, was an example of "classical pertussis vaccine encephalopathy" and consistent with DPT reactions documented in medical literature. P. Exhibit 39 at 21–24. Dr. Kennedy stated "that within certainly 24 hours he was a different baby ... that his nervous system was affected, so that he no longer responded, developed or behaved as he had clearly done normally until that time." Tr. at 96. Dr. Kennedy and Dr. Geraghty stated their opinion, that based upon a reasonable degree of medical certainty, Tommy's injuries were caused by the DPT shot he received on April 25, 1955.[7] P. Exhibit No. 39 at 21; Tr. at 96 and 109.

7. In addition to the opinion statements of Doctors Kennedy and Geraghty, the record contains statements of five other medical doctors that support petitioner's claim. Dr. Edwin H. Abrahamsen's diagnosis on November 25, 1955, was "retardation possibly secondary to pertussis inoculation." P. Exhibit No. 14. On December 1, 1955, Dr. Abrahamsen stated, "There is reason to suspect that this may be a post pertussis vaccine encephalopathy ..." P. Exhibit No. 15.

Respondent proposes an alternative intervening cause and alleges that Tommy's condition was the result of Krabbe's disease, Schilder's disease, or some other demyelinating disease. According to medical testimony, these rare diseases affect the white matter of the brain, that part of the brain which contains the nerve fibers ensheathed with a fatty material called myelin. Myelin carries nerve impulses to the body or other parts of the brain. These diseases are described as degenerative in nature, involving a gradual loss of functional behavior, social responsiveness and developmental achievement. They are often accompanied by seizure activity, a loss of vision, and a general loss of all vital activity. Tr. at 103. Very often these diseases are accompanied by abnormalities in the spinal fluid.

The possibility of Krabbe's disease or Schilder's disease appears on the hospital records in a notation by a resident physician made upon Tommy's discharge from St. Christopher's Hospital for Children in Philadelphia (hereinafter St. Christopher's) in the Fall of 1955. P. Exhibit No. 13. Respondent argues that these notations and the record as a whole could be construed as supporting a more gradual loss of function consistent with the named diseases.

Petitioner's medical experts disagreed. There was no finding of abnormalities in the spinal fluid, and although this finding does not exclude the possibility of a demyelinating disease, Dr. Kennedy concluded that Krabbe's or Schilder's diseases would be less likely. Tr. at 18. Both Dr. Kenne-

dy and Dr. Geraghty, and, apparently, Dr. Arey, the pathologist who performed the autopsy, ruled out the possibility of these disorders. According to these doctors, the record does not support a gradual, subtle onset of loss of function. On the contrary, Tommy "changed overnight." Tr. at 136. Dr. Kennedy stated that, "a sharp change is not characteristic of [these] diseases." Tr. at 106.

Doctors Kennedy and Geraghty were also influenced by the fact that, after the initial notation by the resident physician, Krabbe's and Schilder's diseases disappear from the record. A teaching institution such as St. Christopher's, in their opinion, would clearly have documented it if this diagnosis [Krabbe's or Schilder's disease] was either substantiated or still felt to be clinically relevant.[8] It is unlikely, they claim, that these eminent pediatric neurologists at St. Christopher's Hospital, leaders in their field, would ignore their presence. In addition, the brain was examined by a superbly qualified pathologist. "Had these very specific disorders been present, they would have been recognized.... There is no such report." Tr. at 105.

Upon cross-examination, Dr. Kennedy agreed that he "supposed" that some physician "might" reach a contrary diagnosis. However, the Doctor reaffirmed that "Krabbe's is downhill" and that "downhill" does not characterize what happened to Tommy. Tr. at 136. Subsequent deterioration, Dr. Kennedy concluded, was not the result of a degenerative disease, but the very likely result of uncontrolled seizure activity. Tr. at 134. When asked whether Tommy Matthews suffered from Krabbe's or Schilder's disease, Dr. Kennedy stated his opinion, "that he had neither." Tr. at

The discharge diagnosis of Dr. Cecelia A. Narowski on January 11, 1956, was "encephalopathy secondary to DPT immunization ..." P. Exhibit No. 18. Dr. Henry W. Baird wrote on March 27, 1956 that he was inclined towards a view that Tommy suffered from "an encephalopathy following pertussis immunization." P. Exhibit No. 19. The pathologist who performed the autopsy wrote on August 30, 1988, that "[Tommy's] lingering illness and death may well have been the result of his second inoculation for [DPT] ..." P. Exhibit No. 31. Dr. Frank Ermilio's letter of August 22, 1988, states his opinion that "the convulsive seizures may have

been due to pertussis vaccine." P. Exhibit No. 16.

8. Tommy's discharge card records a doctor's diagnosis upon each of 4 occasions. None mentions Krabbe's disease or Schilder's disease, and two mention specifically "post-pertussis" and "DPT immunization" encephalopathy. P. Exhibit 34 at 24. Dr. Arey, who performed the autopsy, wrote on August 30, 1988, that Tommy's "... illness and death may well have been the result of his second inoculation for [DPT] ... of these three agents ... most likely to be that against pertussis." P. Exhibit No. 31.

104. Dr. Geraghty was of the same opinion. Tommy's deterioration, according to Dr. Geraghty, was not part of the logical evaluation of a progressive disorder but the "hepatoxic" side effects and demineralization of bone caused by anti-seizure medications as well as difficulty in maintaining nutrition. He saw no evidence of a disease condition not related to his injury and had "absolutely no doubt whatsoever" that Tommy's death was due to the DPT shot he received on April 25, 1955. P. Exhibit No. 39 at 41.

In weighing the evidence the court must find that there is not a preponderance that the injury was due to factors unrelated to the administration of the vaccine. § 300aa–13(a)(1)(B). As previously noted, the statute assists the trier of fact by clarifying that such "unrelated factors" do not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause. § 300aa–13(a)(2)(A). Respondent's allegations are based on vague, unsubstantiated possibilities. Evidence of Krabbe's or Schilder's disease, as alternative cause of Tommy's injury and death, is clearly hypothetical.

Finally, the fact that Tommy lived for six years does not alter the fact that his death was vaccine-related. The gross diagnoses listed in the autopsy report are consistent with the type of deterioration discussed by the medical experts as the consequence of Tommy's injury and treatment.[9] The death certificate cites bronchopneumonia and cerebral palsy as immediate causes of death. P. Exhibit No. 32. Dr. Kennedy testified that bronchopneumonia is a common finding in the last stages of terminal illness. Tr. at 140. Dr. Arey, the pathologist, explains cerebral palsy as a term that encompasses a group of disorders caused by a non-progressive damage to the brain. P.

Exhibit No. 30. None of these facts affects the court's ultimate finding of vaccine-related injury and death.

## ADMISSIBILITY OF EVIDENCE

### I. Respondent's Medical Evaluation

At the hearing held on May 16, 1989, respondent moved the admission of a document, Vaccine Injury Compensation Program (VICP) Medical Review Case No. 88–15V (hereinafter Medical Review), prepared by Dr. McCormick, a senior medical officer at the Department of Health and Human Services (HHS). The document was offered in lieu of sworn testimony. The Medical Review evaluates records filed with the petition and additional documentation supplied by petitioner at respondent's request. The Medical Review forms the basis for respondent's contesting of petitioner's entitlement to compensation.

The Medical Review was made available to petitioner several weeks in advance of the hearing. Respondent's expert did not appear as a witness in these proceedings. In addition, petitioner's request that Dr. McCormick be made available for deposition, was declined. The court was informed that Dr. McCormick would not be available for sworn testimony or cross-examination, either in person or by telephone, as a matter of policy. Tr. at 166–67.

Petitioner objects to the admission of the Medical Review on the basis that the Medical Review is hearsay and does not fall within any exception contained in the Federal Rules of Evidence. Respondent argues that the court is required to consider relevant scientific evidence in making its determination. Respondent argues also that the contents of the Medical Review were discussed by petitioner's expert witnesses and that "insinuations as to its existence permeates petitioner's case in chief." Tr. at 151.

---

9. In response to the deterioration question, Dr. Geraghty states as follows: "A. You have to be careful how you define deterioration. If you're talking about that child who is deteriorating as part of the logical evaluation of a clinic syndrome that is a progressive disorder, no, he was not.

If on the other hand you are talking about the wear and tear taking its toll on Thomas as he does not eat properly, as they cannot maintain his nutrition, and probably and possibly due to medical side effects, then indeed he is deteriorating." P. Exhibit No. 39 at 35.

After considering the arguments of counsel, the matter was taken under advisement and ruling reserved. The court agreed to address the admissibility of the document in its opinion. For the reasons stated below, petitioner's objection to the admission of the Medical Review is sustained.

An opposing party has a right to be informed of defenses that may be raised against its claim and sufficient time to prepare its case. Petitioner in this case had advance notice of the contents of respondent's Medical Review. Petitioner knew its negative position, and, as the transcript of the hearing demonstrates, petitioner's own expert knew the contents of the document and, in deposition testimony, refuted its presumptions. Tr. at 23. The document, then, is not found faulty for lack of sufficient notice. Admissibility of the Medical Review falters on other grounds.

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Unless it falls within one of the exceptions provided by the rules, or by an Act of Congress, it is not admissible. Fed.R.Evid. 802.

The Medical Review is clearly hearsay. It is an out of court statement, prepared by an interested party, prepared specifically for this case, and is offered for the truth of the matter asserted. The document does not fall within any of the exceptions to the hearsay rule enumerated in the Federal Rules of Evidence. As petitioner argues, "it does not even fall within the catch-all that is provided in Federal Rules of Evidence 803(24) or 804(5)" because without the opportunity to probe the declarant's expertise or the logic on which the expert's opinion is based, it lacks the equivalent circumstantial guarantees of trustworthiness. Tr. at 42.

By challenging petitioner's claim that injury and death were vaccine-related, respondent makes this proceeding fully adversarial. Not every vaccine injury case will rise to this same adversarial level. In some vaccine cases respondent concedes causation. The question before the court is what standard of admissibility shall be used in contested cases that is both reasonable in light of the purposes of the Vaccine Act, and fair. In cases where petitioner's entitlement to compensation is challenged, is it reasonable or fair to require petitioner to subject its own evidence to scrutiny and attack but deny petitioner the right to challenge evidence presented against its case? The answer is no. The Federal Rules of Evidence provide reasonable guidelines for adversarial proceedings. There is no compelling reason why the rules should not be applied to vaccine-injury cases—to bring order and consistency to the admission of evidence, and to exclude evidence that, although relevant, is prejudicial.

The respondent argues that Congress intended this proceeding to be more informal and that rules of evidence should be relaxed. In particular, respondent cites section 2113 of the Vaccine Act which provides that in determining whether to award compensation under the Vaccine Act, the court is required to consider "any diagnosis, conclusion, medical judgment or autopsy or coroner's report which is contained in the record ..." § 300aa–13(b)(1). Respondent, however, overlooks the implications of subsection (a) of the same section. The "record" is defined by subsection (a) as that record *established by the court* during the course of proceedings under the Vaccine Act. The Special Master, as an adjunct of the court, is to conduct hearings, to require such evidence as may be appropriate, and to require testimony as may be reasonable. § 2112(c)(2). The special master is under an obligation to conduct those proceedings and establish that record in a manner that is both consistent with the rules and fair.[10] The statute does not require rules of evidence to be relaxed when to do so would unfairly prejudice a party's case.

---

**10.** Vaccine Rule 43(a) provides: "If the testimony of witnesses is required, it shall be taken orally unless otherwise provided by an Act of

Congress or by these [Vaccine] rules, *or by the Federal Rules of Evidence.*" (emphasis supplied).

The HHS Medical Review takes a position contrary to that of petitioner and contrary to the testimony of petitioner's experts. Petitioner has a right to know the basis for those opinions, to learn what sources are being used, and to probe their reliability. In short, petitioner has a right to cross-examine the witness and to question the contents of the document. The court, also, has a right to consider the credibility of the expert witness and the relative merits of that expert's conclusions in order to choose between conflicting opinions. The Vaccine Act affirms this right. *See* § 300aa–12(c). The court would prefer to have Dr. McCormick explain and defend the statements contained in the Medical Review. The court will not admit those statements, however, without scrutiny. Fairness requires that the Medical Review be excluded.

## II. Dr. Geraghty's Letter

Petitioner moved the admission of Petitioner's Exhibit No. 33, a report prepared for this case by Dr. Kevin Geraghty, one of petitioner's expert witnesses. The report, dated April 27, 1989, consists of two parts: Part A is Dr. Geraghty's written statement of opinion based on the petition and attached documents filed in this action; Part B is a paragraph-by-paragraph critique of the HHS Medical Review. Part B quotes substantial portions of the text of the HHS Medical Review. Petitioner moves the admission of Part A unconditionally. Petitioner moves the admission of Part B, however, only if the court determines that respondent's Medical Review should be admitted into evidence.

A copy of Dr. Geraghty's report was hand delivered to respondent on two separate occasions, five days and three days, respectively, prior to the deposition. The deposition Dr. Kevin C. Geraghty was taken pursuant to notice on May 8, 1989. Counsel for respondent did not deny that the document had been delivered to him at his office as claimed. Tr. at 104. Counsel stated, however, that he did not read it prior to the deposition. Tr. at 146.

Respondent objects to the admission of Part A of the document. Respondent alleges, first, that Dr. Geraghty's written opinion is hearsay on the same basis as the HHS Medical Review. Secondly, respondent alleges that Part A repeats what is in Dr. Geraghty's depositional testimony and is, therefore, cumulative.

Petitioner points out a basic difference between Dr. Geraghty's written opinion and the HHS Medical Review. Petitioner argues that respondent participated in the May 8, 1989 deposition of Dr. Geraghty. Respondent had possession of the document in question at the time of the deposition and had an opportunity to question its conclusions during cross-examination. Counsel failed to do so. In addition, counsel for respondent raised no objections to any discussion of matters contained in Dr. Geraghty's report during the deposition. On the other hand, petitioner was denied access to Dr. McCormick, respondent's expert. Counsel had no opportunity to examine Dr. McCormick's credentials or question the conclusions contained in the HHS Medical Review. Petitioner argues that because Dr. Geraghty was available for cross-examination, the doctor's written opinion falls within the exception of Federal Rules of Evidence 803(24) or 804(b)(5) because it has the requisite circumstances that guarantee trustworthiness. Tr. at 146.

The court recognizes the difference in circumstances surrounding the two medical opinions. The court agrees that opportunity to examine the witness, although no guarantee of credibility, lessens the danger of prejudice and increases the probative value of the testimony. However, the exception upon which petitioner relies permits an out of court statement only if the statement "is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts[.]" Fed.R.Evid. § 803(24); 804(b)(5). Dr. Geraghty's written opinion statement does not withstand this test. Dr. Geraghty's deposition testimony is a sworn statement and is the better evidence. Petitioner offers the written opinion statement, not as part of the deposition testimony, but as an independent ex-

hibit. It should be noted, also, that Dr. Geraghty's written opinion is essentially a summary of matters discussed fully in the deposition testimony. The document is, therefore, cumulative, and petitioner will not be prejudiced by its exclusion. Respondent's objection to the admission of Part A, Dr. Geraghty's written statement of opinion, is hereby sustained. Since petitioner's offer of Part B of Dr. Geraghty's report is conditioned upon the inclusion of respondent's Medical Review, and since the Medical Review has been ruled inadmissible, Petitioner's Exhibit No. 33 is excluded in its entirety.

### III. Affidavit of Dr. McCormick

During the course of the hearing, counsel for respondent offered as an exhibit an affidavit of Dr. McCormick, respondent's medical expert at HHS. The affidavit was a more detailed explication of matters contained in the HHS Medical Review, and in addition, contained new materials. The affidavit was accompanied by five documents, including a 2–page bibliography, tables and graphs relating to the clinical course of Tommy Matthews, the curriculum vitae of Dr. McCormick, and a collection of ten learned treatises or articles listed in the bibliography. Counsel for respondent stated that these documents had been provided to him that very morning during the course of petitioner's case-in-chief. Tr. at 157. The documents had not been supplied to petitioner or to the court. Petitioner's experts, therefore, had no time to review the materials, to search for articles reaching different conclusions, or to address the logic of statements made in the affidavit. In addition to lack of notice, petitioner argued, these materials suffer the same defects that characterize the HHS Medical Review. Respondent's motion was denied and documents marked Appellate Exhibits II, III, IV, V and VI were rejected as inadmissible hearsay. Respondent made an offer of proof. Tr. at 159–167.

The ten articles identified as Appellate Exhibit VI could have been admitted had petitioner been given sufficient notice to permit submission of articles supporting its own position. The articles do not present evidence about this particular claim but about the general state of scientific knowledge. The court, however, has no obligation to consider such materials offered without notice at such a late date. *See Association De Compositores v. Copyright Royalty*, 809 F.2d 926 (D.C.Cir.1987). (Following well-established precedents, the Court of Appeals declined to consider a novel contention first supplied in a reply brief.) Respondent had ample notice of the hearing. Three status/settlement conferences were held prior to the hearing. The hearing date was selected by agreement of the parties during the second conference, held on February 22, 1989, and memorialized in an order of the undersigned on February 24, 1989. By order of the undersigned filed on April 4, 1989, each party was required to submit a statement, prior to a pre-hearing conference, setting forth a list of exhibits it expected to offer at the hearing. The order stated that failure to list an exhibit, or to amend the list at the earliest practicable time, would result, absent a show of compelling reason for the failure, in an exclusion of the exhibit at the hearing. The pre-hearing conference was held on May 9, 1989, one week before the hearing. Petitioner complied with the order. Respondent did not comply with the order. In fact, none of the written statements requested by the April 4th order was ever submitted by respondent prior to the presentation of respondent's case in chief.

## AMOUNT OF THE AWARD

### I. Compensation

The first element of the award in this case, $250,000, is mandated by § 300aa–15(a)(2), which states that an award shall include, "in the event of a vaccine-related death, an award of $250,000 for the estate of the deceased." [11]

---

**11.** Section 300aa–33(2) defines the term "legal representative" as "a parent or an individual who qualifies as legal guardian under the State Law." Donald J. Matthews, Sr., father of the

deceased, and husband of Eleanor Matthews, mother of the deceased, is the legal representative of Thomas Edmund Matthews, and is quali-

The second element is $30,000 for attorneys' fees and costs.

## II. Attorneys' Fees

The Vaccine Act expressly provides for reimbursement of reasonable attorneys' fees and other costs for petitions filed in this court. The award of attorneys' fees may be made under two circumstances; where the litigant has been successful in its claim or where the claim was brought in good faith and there was a reasonable basis for such a claim. § 300aa–15(e)(1).

In cases filed before the effective date of the Act, the amount of fees and costs is expressly limited by § 300aa–15(b).

Compensation awarded under the Program to a petitioner [in a retroactive case] ... may include attorneys' fees and other costs included in a judgment under subsection (e) of this section [authorizing attorneys' fees], except that the total amount that may be paid as compensation under [the provisions for compensation for lost earnings and pain and suffering and emotional distress] and included as attorneys' fees and other costs under subsection (e) of this section [authorizing attorneys' fees] may not exceed $30,000.[12]

This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is to be based upon the "lodestar" model approach. *See Gregson v. Secretary of the Dept. of Health and Human Services*, No. 88–1V Slip Op. at 4 (U.S.Cl.Ct. April 24, 1989) opinion and order. The lodestar is the product of the reasonable hours expended times the reasonable hourly rate. The resulting figure is an objective estimate, presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). "In requesting statutory fees, an attorney must use the same 'billing judgement' as an attorney would in billing a client." *Gregson*, at 7. The reasonable hourly rate is "the

prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

The second step in calculating reasonable attorneys' fees is more subjective. The lodestar figure is subject to adjustment, either upward or downward, through the application of various factors. Factors to be considered include those identified in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974), as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–719.

Many of these factors, however, such as "novelty", "complexity of issues", "results obtained", and "quality of representation" are generally reflected in the billable hours or the hourly rate used in calculating the lodestar figure and, therefore, should not provide an independent basis for adjusting the award. *Blum*, 465 U.S. at 898–902, 104 S.Ct. at 1548–1551; *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1988).

The fee applicant carries the burden of proof. To meet such a burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As Judge Harkins wrote in *Martin v. United States*, 12 Cl.Ct. 223 (1987):

A party submitting an application for an award of attorney fees should present

---

fied under § 300aa–11(b)(1)(A) to bring this action.

**12.** Since this case involves the death of the child, Tommy Matthews, pain and suffering and lost earnings will not be considered.

evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

*Martin v. United States*, 12 Cl.Ct. at 227, citing *Hensley v. Eckerhart*, 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943. To demonstrate "reasonable hours" worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition. The applicant need not account for every minute expended. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12.

Proof of prevailing market rates for a lawyer's services may be demonstrated in a number of ways, including:

(1) Affidavits of other attorneys or experts;

(2) Citations to prior precedents showing reasonable rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases;

(3) References to fee award studies showing reasonable rates charged or awarded in the relevant community;

(4) Testimony of experts or of other attorneys in the relevant community;

(5) Discovery of rates charged by the opposing party;

(6) Reliance on court's own expertise to recognize applicable prevailing rates.

*Gregson*, at 9 (citing Newberg, Attorney Fee Awards 198 (1986).

In light of these criteria, counsel in the instant case were especially thorough in preparation of their fee application. In fact, petitioner has modeled its motion on the *Gregson* decision. The time expended and hourly rates are broken down accordingly:

| NAME | POSITION | RATE | TOTAL HOURS | TOTAL FEES |
|---|---|---|---|---|
| Anthony Roth | Associate | $155.00 | 293.1 | $45,430.50 |
| William Gardner | Partner | $250.00 | 7.5 | $ 1,875.00 |
| Janine Sweeney | Associate | $175.00 | 5.5 | $ 962.00 |
| James Matthews | Partner | $250.00 | 4.7 | $ 1,175.00 |
| Ann Johnson | Paralegal | $ 60.00 | 3.5 | $ 210.00 |
| | | | 314.3 | $49,652.50 |

Memorandum in Support of Petitioner's Motion for Reasonable Attorneys' Fees and Costs at 11, 20 and 21 (hereinafter P. Memo. at ——).

---

In support of its prayer for compensation, petitioner submitted affidavits by Mr. Roth and Mr. Gardner, a memorandum in support of petitioner's motion for reasonable attorneys' fees and costs, and a detailed, computerized print-out of hours billed.

### REASONABLE FEES

The total number of hours spent in representing the petitioner is 314.3. This number is multiplied by billing rates of the various members of the legal team. This is the "lodestar product". This raw figure is entitled to a presumption of reasonable-

ness. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. Any hours that may be deemed "excessive, redundant, otherwise unnecessary" are excludable. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940.

In the instant case, Mr. Roth is responsible for the overwhelming majority of the hours expended. The computerized print-out of detailed daily time sheets and the summary of services provided are sufficient to make a fair evaluation of the time expended, the nature, and the need for the service.

As to the reasonableness of Mr. Roth's hourly rate, the method of proof chosen by Mr. Roth is an affidavit by his supervisory attorney, Mr. Gardner, as to prevailing market rates in the community. *See* Gardner affidavit at 2. A similar assertion is attorney, Mr. Gardner, as to prevailing market rates in the community. *See* Gardner affidavit at 2. A similar assertion is made in the supporting memorandum. P. Memo. at 21. An affidavit from a disinterested source would have been preferable, but the court has no reason to question the accuracy of this assertion. Moreover, the court is free, under the *Gregson* opinion, to recognize applicable prevailing rates on the court's own expertise. The court finds that the hourly rate for Mr. Roth is comparable to those of attorneys of comparable skill, experience, and reputation in the local community.

The second step in determining reasonable fees, subjects the lodestar figure (here $49,653, however, petitioner does not contest the cap) to adjustment, upward or downward, based on factors established by *Johnson v. Georgia Highway Express*, listed above. Mr. Roth contends that it should not be decreased. In support of this contention, Mr. Roth states that the majority of hours spent in this matter were expended in response to respondent's unreasonable demands for additional and often duplicative information. In addition, respondent's failure to participate meaningfully in the pre-hearing process forced petitioner to prepare to prove elements of this case, that, with respondent's cooperation, could have been subject to stipulation. P. Memo. at 24–28. (At the May 16th hearing, respondent's counsel conceded that its position had not been fully conveyed to petitioner's counsel prior to the hearing. Tr. at 22.) Further, Mr. Roth argues that the novelty of the Act, the skills required to properly discharge his task and the time limitations imposed by the statute all buttress his contention that the figure should not be reduced. P. Memo. at 29–31. The court affirms that petitioner's counsel did not engage in overbroad or repetitive work, and that the time expended is reasonable under these circumstances.

In sum, the court does not dispute the hours expended nor Mr. Roth's hourly charge. They are entirely reasonable. Unfortunately, counsel has documented far more hours than can be compensated. The four additional members of the legal firm who assisted Mr. Roth account for only 20 of the 314.3 hours claimed. While their rates are not unusual for partners and associates in Washington, D.C., a discussion of their appropriateness in this case is unnecessary because the claim for fees greatly exceeds the $30,000 cap, and the court is powerless to award the full amount claimed.

## COSTS

Applicant has submitted a claim for costs in the amount of $8,475.42. These costs are itemized in Exhibits 4 through 10 attached to the affidavit of Anthony C. Roth. Further, a detailed summary is included in the applicant's memorandum. P. Memo. at 31–37. These costs, including consultant and expert witness fees, travel expenses, court costs, and other miscellaneous charges, are reasonable and should be allowed. For the reasons stated above, the court finds that an award of $30,000, including $21,524.58 in attorneys' fees and $8,475.42 in costs, is justified.

This case appears to be appropriate for an award under the National Vaccine Injury Compensation Program, and the amount of $280,000 appears to be an appropriate figure for that award. It is hereby recommended that the court enter a judgment in favor of petitioner in that amount.